516 So.2d 726 (1985)
Carnel JACKSON
v.
STATE.
6 Div. 767.
Court of Criminal Appeals of Alabama.
April 9, 1985.
As Modified on Denial of Rehearing June 11, 1985.
*734 Orson L. Johnson, George W. Andrews III and L. Dan Turberville, Birmingham, for appellant.
Charles A. Graddick, Atty. Gen., and William D. Little, Rivard Melson and Ed Carnes, Asst. Attys. Gen., for appellee.
PATTERSON, Judge.
Carnel Jackson, the appellant, was indicted in a three-count indictment for the capital murder of Myra Faye Tucker and Terry Wayne Tucker, under งง 13A-5-31(a)(10), (2), and (3), Code of Alabama (Supp.1978) (repealed 1981), respectively.[1]
Upon conclusion of the State's evidence, the trial court, on motion of appellant, excluded Count 2, charging intentional murder during a robbery, for insufficient evidence. The case went to the jury on Counts 1 and 3, which are as follows:
"CARNEL JACKSON ... did, by one act or a series of acts, unlawfully, and with malice aforethought, intentionally cause the death of Myra Faye Tucker, a human being, by shooting her with a shotgun, and unlawfully and with malice aforethought did intentionally cause the death of Terry Wayne Tucker, a human being, by shooting him with a shotgun, in violation of ง 13A-5-31(a)(10) of the Alabama Criminal Code.
"...
"3rd: CARNEL JACKSON, a male, did engage in sexual intercourse with Myra Faye Tucker, a female, by forcible compulsion, and did forcibly ravish said Myra Faye Tucker, and in the course of said rape, the said CARNEL JACKSON did intentionally cause the death of another person, the said Myra Faye Tucker, by shooting her with a shotgun, in violation of ง 13A-5-31(a)(3) of the Alabama Criminal Code."
Jackson pleaded not guilty. Prior to trial he had filed a written plea of not guilty by reason of mental disease which caused him to lack substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law, but just prior to commencement of trial, his attorney stated to the court that Jackson would only enter a plea of not guilty. In his opening statement to the jury, Jackson's counsel stated, "To this indictment Carnel Jackson pleads not guilty." On November 19, 1981, the jury returned verdicts *735 of guilty of the capital offenses charged in Counts 1 and 3.
At the sentence-determining phase conducted in accordance with Beck v. State, 396 So.2d 645 (Ala.1980), the jury fixed appellant's punishment at death. Thereafter, the trial court held a sentencing hearing and after weighing the aggravating and mitigating circumstances, and considering the fixing of the punishment of death by the jury, sentenced appellant to death by electrocution.
The bodies of Myra Faye Tucker and her husband, Terry Wayne Tucker, were discovered on an old mining road in Jefferson County, Alabama, on January 17, 1981. They were lying 15 to 20 feet apart. Found inside the blouse of Mrs. Tucker was a crumpled partial South Central Bell telephone bill bearing the number "925-9087" and the name "Godbolt." Three recently fired Remington Peters .12-gauge shotgun shells were found near the bodies. Two were marked "Express Power Piston 6" and one "Express Power Piston 5." There was a "depression" in the ground with the plastic wadding from a shotgun shell lying 12 inches from it. Mrs. Tucker had been shot once in the chest from a distance of 5 to 7 feet, and Mr. Tucker had been shot once in the back from a distance of 2 to 4 feet. They had been shot and killed where their bodies were found, and they had been dead for a period of a few hours to not more than twenty-four hours.
The autopsy of Mrs. Tucker's body disclosed that the massive injuries from the single shotgun blast were the cause of death. Microscopic examination of swab smears taken from her oral cavity, rectum, and vagina disclosed the presence of seminal fluid and sperm cells in all three body cavities. The seminal fluid and sperm cells from the vaginal cavity were from a male with a blood "ABO type O, secretor." The presence of sperm in the vagina was consistent with sexual intercourse. No determination as to the blood type was possible from the seminal fluid and sperm cells found in the oral and anal cavities. Both Mr. and Mrs. Tucker had type A blood. Seminal fluid and sperm cells from an ABO type O, secretor were also found on Mrs. Tucker's panties.
The autopsy of Mr. Tucker's body disclosed that he died from massive injuries caused by a single shotgun blast in the back. He had also suffered recent blunt force injuries to his head which caused a subdural hematoma and, also, abrasions to the front and back of his head and neck.
Shortly after the discovery of the bodies, the victims' automobile, stripped of its tires and partially burned, was discovered some distance away.
On January 21, 1981, appellant and Jerry Steven Godbolt[2] were arrested. On January 26, 1981, Wayne Anthony Agee[3] was arrested. All three were charged with the murder of the Tuckers. At the time this incident occurred, appellant was 17 years old, Godbolt was 21 years old, and Agee was 19 years old.
Specimens of blood and saliva were taken from Jackson, Godbolt, and Agee and analyzed. Appellant's blood type was ABO type O, secretor. Godbolt's was also ABO type O, secretor. Agee's was type A.
On January 23, 1981, a .12-gauge Remington Sportsman shotgun was found in the yard of Godbolt's mother. There were blood stains on the gun, but an insufficient amount to determine whether it was human blood. A firearms expert testified that in his opinion all three shotgun shells found at the scene of the crime were fired from this shotgun. The shotgun was semi-automatic, the type that ejected empty shells automatically when fired. The shotgun belonged to Godbolt.
The firearms expert opined that the shell wadding retrieved near the bodies was from a Remington Peters .12-gauge shotgun shell. He was also of the opinion that the shot taken from Mrs. Tucker's chest were number 6 shot, and that the wadding taken from her chest was from a Remington Peters .12-gauge shotgun shell. He *736 was further of the opinion that the shot taken from Mr. Tucker's back were number 5 shot, and that the wadding taken from the wound was from a Remington Peters.12-gauge shotgun shell.
A witness for the State, William Cole, testified that he had known appellant, Godbolt, and Agee for about four years. He testified that he had seen them together a few times and that he specifically saw them together at a party in Bessemer the night of the murder of the Tuckers. He stated that they arrived together in Agee's automobile, and that they later told him they were going to leave. He did not see them at the party after that, but later, about midnight, he saw Agee's automobile coming through the "project" about 300 feet from where Godbolt lived. The next morning (Saturday) around 9 or 10 o'clock, he went to appellant's house in the project, but appellant was not at home. Cole then went to Godbolt's apartment in the project and Godbolt and Agee were there. While there, he observed a shotgun standing in the corner of the room. He testified that it belonged to Godbolt, and he identified the shotgun in evidence as the same one he had previously seen in Godbolt's apartment. He further stated that appellant was coming toward Godbolt's apartment when he was leaving.
On September 8, 1981, Sgt. Ballard of the Birmingham Police Department received a telephone call from a person who identified himself as appellant and who asked to speak to Sgt. Gay, the detective in charge of the Tucker investigation. Sgt. Ballard advised the caller that Sgt. Gay was not in, and the caller left for Sgt. Gay the message that "he wanted Sgt. Gay to come to the County Jail and talk to him, that it was very important." Upon receiving the message, Sgt. Gay, accompanied by a Sgt. Miller, went to the Jefferson County Jail and called upon appellant. Sgt. Gay informed appellant of his Miranda rights, whereupon appellant made an oral statement implicating himself in the crime. We quote verbatim from the record Sgt. Gay's testimony concerning the oral statement of appellant:
"Q. And what did youโwhat was the conversation between you and Carnel Jackson on this occasion?
"A. Well, I went to the D cell, where he was and I asked Carnel did he want his attorney, and he said, `No,' then I read him these rights. He said he didn't want to talk in front of Sergeant Miller, who was with me, and Sergeant Miller walked out. He said, `I know it's your job to put people in jail, and I know when people violate the law you work hard to put people in jail.' He said, `I don't hold that against you.' He said, `I'm going to be tried first and no matter how my case turns out I will testify against Godbolt and Agee, because we all three were together.' I asked him if he had talked to his attorney about this and he said, `No, I don't need to talk to him, because I have made up my mind to tell about it from the beginning.' He said, `You know there are more people out there that know about it than you have as witnesses,' and I said `Yes, I know,' and he said, `After my trial I'll tell you.' I said, `You don't want them to testify against you?' and he said, `That's right.' He said it was Godbolt's idea. They were supposed to rob some place. He said he was under drugs `when I killed the two people, all three of us was on drugs.' He said Godbolt shot into the ground, dirt flew up in his face and that pissed him off. He grabbed the shotgun, he shot her first and then him."
Appellant called several witnesses to testify concerning his various motions. He called one witness to testify before the jury during the trial in chief, Dr. John J. Callahan, a psychiatrist, who testified that he had examined appellant and that it was his opinion that appellant was functioning in either the dull normal or the borderline range of intelligence. He stated that his I.Q. range was between 70 and 85. On cross-examination, Dr. Callahan testified that in his opinion appellant was not suffering from any psychoses, neuroses, or organic brain problem, and was fully aware of what was going on. Twenty issues are raised by appellant on appeal. We address *737 them in the order presented in appellant's brief.

I
Appellant contends that the Alabama Supreme Court's severance of the preclusion clause from ง 13A-5-31(a) in Beck v. State, 396 So.2d 645 (Ala.1980), was an unconstitutional encroachment on the legislative process because the preclusion clause was a material part of the Act, incapable of severance, hence making the entire Act unconstitutional. This exact issue was addressed in Beck v. State, and numerous subsequent cases, in which it was determined that the court's reconstruction of ง 13A-5-31 was a constitutionally permissive procedural change. See, e.g., Clisby v. State, 456 So.2d 95 (Ala.1983); Potts v. State, 426 So.2d 896 (Ala.1983).

II
Appellant contends that Alabama's method of carrying out a death sentence by electrocution constitutes cruel and unusual punishment and should be declared unconstitutional. The United States Supreme Court addressed the death by electrocution issue in In re Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890). In determining what constitutes cruel and unusual punishments, the Court stated: "Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel within the meaning of that word as used in the constitution. It implies there is something inhuman and barbarous,โsomething more than the mere extinguishment of life." Id. at 447, 10 S.Ct. at 933. In holding that such a punishment is not cruel or unusual, the Court reasoned "that this act was passed in the effort to devise a more humane method of reaching the result". Id. Accord Spinkellink v. Wainwright, 578 F.2d 582, 616 (5th Cir.1978). Appellant's contention is therefore without merit; death by electrocution does not amount to cruel and unusual punishment per se, but is a constitutional means of imposing a sentence of death.
Appellant further argues that Alabama's method of electrocution is particularly inhumanely cruel as demonstrated by the repeated application of electricity needed to cause the death of John Lewis Evans. In Francis v. Resweber, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947), the United States Supreme Court, in addressing the issue of whether it was cruel for a state to electrocute a prisoner after the state's first attempted electrocution failed, stated:
"The cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment, not the necessary suffering involved in any method employed to extinguish life humanely. The fact that an unforeseeable accident prevented the prompt consummation of the sentence cannot, it seems to us, add an element of cruelty to a subsequent execution. There is no purpose to inflict unnecessary pain nor any unnecessary pain involved in the proposed execution.... We cannot agree that the hardship imposed upon the petitioner rises to that level of hardship denounced as denial of due process because of cruelty."
Id. at 464, 67 S.Ct. at 376.
The very issues raised by appellant here were addressed in Ritter v. Smith, 568 F.Supp. 1499 (S.D.Ala.1983), aff'd in part, rev'd in unrelated part, 726 F.2d 1505 (11th Cir.), cert. denied, 469 U.S. 869, 105 S.Ct. 218, 83 L.Ed.2d 148 (1984), wherein the court adopted the opinion and views expressed by Judge Sam C. Pointer after a hearing on the issues, in Raines v. Smith, No. 83-P-1080-S (N.D.Ala.) (unpublished order entered June 3, 1983) (certified copy attached as Appendix, Ritter v. Smith, 568 F.Supp. at 1525-27). The claims presented to Judge Pointer were as follows: (1) given the nature of the equipment and the procedures used, there was unnecessary and wanton infliction of pain and suffering upon persons subject to electrocution in Alabama; (2) the equipment and method involve an unreliable method of execution; and (3) electrocution involves, in its method and equipment, a mutilation of the body which should be viewed as contrary to and violative of the Eighth Amendment. Id. at 1525-26.
*738 After an evidentiary hearing, Judge Pointer held that the claims were due to be dismissed. Id. at 1527. In reaching this decision, Judge Pointer noted that the testimony established that over the past 50 years the chair in question had been used approximately 154 times without any failure; that Evans suffered no pain after the initial shock; and that the possibility that the chair may malfunction at some time in the future does not render its use unconstitutional. Id. at 1526. Judge Pointer relied upon Francis v. Resweber and In re Kemmler in holding that the Alabama method of electrocution is constitutional. Id. at 1526-27. We agree.
There is no evidence before this court that contradicts the findings made by Judge Pointer. There has been absolutely no showing that the State's method of enforcing a death sentence inflicts any more pain than is absolutely necessary. It has not been established that the equipment used in the electrocution of John Lewis Evans malfunctioned or that Evans felt anything after the first split-second of the first jolt of electricity administered.

III
Appellant's third contention is that the Circuit Court of Jefferson County, Birmingham Division, lacked jurisdiction to try this case. Appellant argues that the action should have been brought in the Bessemer Division of the Circuit Court of Jefferson County, pursuant to the Bessemer Court Act of 1919, 1919 Ala. Local Acts 62, No. 213 (August 18, 1919), (Local Laws of Jefferson County, Sections 950-957, page 320). This issue was thoroughly addressed in the companion case of Agee v. State, 465 So.2d 1196 (Ala.Crim.App.1984), cert. denied (Ala. 1985), wherein this court held that "the Bessemer court legislation should be read as venue legislation ...." Id., 465 So.2d at 1204.
Viewing appellant's contention as relating to venue, rather than jurisdiction, we are convinced that the Birmingham Division had proper venue in this case. At the trial, Jefferson County Deputy Coroner Canoy testified that the bodies of Mr. and Mrs. Tucker were located in the Birmingham city limits in the Powderly area. A portion of Mr. Canoy's testimony in reference to the location of the bodies of the victims and the apparent place of the commission of the crimes is as follows:
"Q. Do you recall where you went?
"A. It was located in the Birmingham city limits in the Powderly area, that's the only thing I can tell you is it was in the Powderly area.
"....
"Q. You have come to know since then that the place where the bodies of the Tuckers were found was actually in the Bessemer Cut-Off, haven't you?
"A. No, sir, it's in the Birmingham City limits in the Powderly area.
"...
"Q. Deputy Canoy, the bodies were found in Birmingham, Jefferson County, Alabama?
"A. Yes, sir, to my knowledge, yes, sir."
Venue may be established by the testimony of one witness. McCrary v. State, 398 So.2d 752 (Ala.Crim.App.), cert. denied, 398 So.2d 757 (Ala.1981). "When the state offers evidence tending to show that the crime was committed within the jurisdiction of the court, the question of venue then becomes one for the jury to decide." Agee, 465 So.2d at 1204 (citations omitted). Venue need not be proven by direct evidence, but evidence from which venue may be reasonably inferred is sufficient. Segars v. State, 409 So.2d 1003 (Ala. Crim.App.1982). The record shows that there was evidence that the crime was committed in the Birmingham Division. We conclude that there were sufficient facts before the jury to afford an inference, and to authorize a conclusion that the crime was committed within the jurisdiction of the court and that venue was proper.
It should be noted that, at the hearing on appellant's motion to dismiss, both parties agreed that the evidence before the trial judge at that time showed that the bodies of Mr. and Mrs. Tucker were located within a quarter-mile of the *739 line that divides the Birmingham Division from the Bessemer Division. The evidence is clear that the Tuckers were killed where their bodies were found. In Agee, 465 So.2d at 1204, this court held that the Birmingham and Bessemer Divisions should be "treated as if two separate counties existed". Thus, we theoretically treat the two divisions as distinct entities and apply the statutory law of Alabama to each as if they were, in fact, separate counties. See Shell v. State, 2 Ala.App. 207, 56 So. 39 (1911). In so doing we are directed to ง 15-2-7, Code of Alabama 1975, which authorizes a finding of proper venue in either county when an offense is committed within a quarter-mile of the boundary between the two counties. The legislature obviously adopted ง 15-2-7, in anticipation of such a close venue question as is presented by the facts of this case.
Accordingly, appellant's contention is without merit; the venue properly lay in the Birmingham Division.

IV
Appellant contends that the court improperly refused his motion for a change of venue, which alleged widespread pre-trial publicity.
An accused is entitled to a change of venue if he can affirmatively demonstrate to the trial court that the pre-trial publicity has so saturated the community as to have a probable impact on the prospective jurors or that there is a connection between the publicity generated and the existence of actual jury prejudice. Fike v. State, 447 So.2d 850 (Ala.Crim.App. 1983); Nelson v. State, 440 So.2d 1130 (Ala.Crim.App.1983); Anderson v. State, 362 So.2d 1296 (Ala.Crim.App.1978); Ala. Code ง 15-2-20 (1975). Except in the situation where there has been a showing of inherently prejudicial publicity which has so saturated the community as to have a probable impact upon the prospective jurors, the trial court's primary responsibility in dealing with allegedly prejudicial pre-trial publicity is whether, as a result of such publicity, it is reasonably unlikely that the defendant can secure a fair and impartial trial. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); Anderson v. State. The constitutional standard of fairness requires that a defendant have a panel of impartial jurors; however, in order to be qualified they need not be totally ignorant of the facts and issues involved. Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977); Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Irvin v. Dowd; Anderson v. State. In Irvin v. Dowd, 366 U.S. at 723, 81 S.Ct. at 1642, the United States Supreme Court stated:
"To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." (Citations omitted.)
However, the juror's assurances that he can lay aside his impression or opinion and render a verdict based on the evidence presented in court cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality. Murphy v. Florida; Irvin v. Dowd; Anderson v. State.
Here, appellant makes no argument that the media coverage of the case was other than objective. An editorial was introduced, but there was no evidence that any juror read it. Moreover, 10 months had elapsed from the time of the commission of the crime until appellant's trial. The passage of time cannot be ignored as a factor in bringing objectivity to the trial. Robinson v. State, 430 So.2d 883 (Ala. Crim.App.1983).
Furthermore, our thorough review of the voir dire proceedings demonstrates no actual *740 existence of any opinion that would raise the presumption of partiality. Of the fifty prospective jurors on the venire, thirty-two stated that they had seen newspaper articles and/or news reports on television about the murder of Mr. and Mrs. Tucker. An individual, extensive voir dire examination in chambers was conducted of each of the prospective jurors who had indicated exposure to publicity. Only six expressed any doubt that they would be able to return a fair and impartial verdict. All six were dismissed for cause. The remainder of the thirty-two prospective jurors testified that they could disregard anything they had read or heard and could render an impartial verdict based solely on the evidence presented in court. All thirty-two were asked individually what they remembered of the pre-trial publicity they had heard or seen. None of them had strong, specific recollection of details, and all but four or five had only vague recollections about what they had read or heard. The four or five jurors who remembered some details gave sketchy accounts of what they remembered. The voir dire of the jurors remaining on the venire revealed no indication of hostility, prejudice, or partiality against appellant that could not be laid aside.
We do not believe that the pre-trial publicity in the case at bar even remotely approaches the magnitude of prejudicial publicity condemned by the Supreme Court in Estes, Sheppard, and Irvin. Outside influences had not so infiltrated the community at large as to render the existence of community prejudice against the appellant probable. Here, there was no trial atmosphere "utterly corrupted by press coverage." Dobbert v. Florida, 432 U.S. at 302, 97 S.Ct. at 2302 (quoting Murphy v. Florida, 421 U.S. at 798, 95 S.Ct. at 2035).
Furthermore, appellant has failed to show a connection between the publicity generated by the news articles and television broadcasts, and the existence of actual jury prejudice. McWilliams v. United States, 394 F.2d 41 (8th Cir.1968), cert. denied, 393 U.S. 1044, 89 S.Ct. 643, 21 L.Ed.2d 593 (1969); Nelson v. State; Anderson v. State. The evidence in this case clearly shows that the jury was not prejudiced against appellant. Appellant has failed to show that the setting of his trial was inherently prejudicial or that the jury selection process of which he complains permits an inference of actual prejudice. We, therefore, find no error in the refusal of the trial judge to grant the motion for a change of venue.

V
During the hearing on the motion for change of venue, defense counsel asked the trial judge to call twelve jurors from the veniremen serving in the courthouse at that time to testify about any exposure to publicity about the death of the Tuckers and appellant's case, and the publicity's effect on them. Appellant claims that the court's refusal to summon the jurors for his examination, coupled with his inability to pay for his own poll sample, deprived him of the means to provide sufficient evidence in support of his motion and, therefore, denied him a fair trial and due process. We do not agree. The questioning of the jurors could have conceivably created problems in the trial of other cases and could have been disruptive to the orderly administration of the court. Defense counsel concedes this. At the time of the request, the instant case had not been set for trial and, in fact, was not tried until four months later. If the jurors had been called, the information obtained from them, if any, would, in all likelihood, have been of limited value. "The proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination." Grayson v. State, 479 So.2d 76, 80 (Ala.1985) (quoting Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim.App.1978)). Appellant cites Robinson v. State, 430 So.2d 883 (Ala.Crim.App.1983), as approving the procedure he sought to use in this case. The trial judge in that case, apparently of his own volition, called at random twelve jurors who were attending court on that date and questioned them about pre-trial publicity concerning the case before the court. This court merely recited this fact in its *741 opinion, and gave neither its approval nor its disapproval to such a procedure.
The decision of whether to grant appellant's request was a matter for the sound discretion of the trial court and we so hold. The trial judge is in the best position, due to his knowledge of the local situation, to determine whether the calling of the jurors would interfere with other cases and disrupt the orderly administration of the court. In making this determination, the trial judge is in the best position to consider the relevancy of the expected testimony of the jurors, the probative value of the testimony at the particular time it is sought, and the testimony's remoteness in relation to the time of trial. In the absence of an abuse of discretion, the trial court's ruling should not be disturbed, and we do not find such an abuse of discretion here. This contention is without merit.

VI
Appellant argues that the admission of his confession constitutes reversible error. He contends that (1) the State failed to prove that he voluntarily, knowingly, and intelligently waived his Fifth Amendment rights enumerated in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); (2) the State failed to prove that he intentionally waived and relinquished a known right to counsel under the Sixth Amendment; and (3) due to his age and limited intellectual capacities, he could not have intelligently, knowingly, and voluntarily waived any rights provided him by the Fifth and Sixth Amendments.

A
Pursuant to Alabama law, a statement made subsequent to an arrest is prima facie involuntary and inadmissible at trial; thus, the State must prove the statement was voluntarily made and must lay a Miranda predicate before the statement is admissible. Thomas v. State, 373 So.2d 1167 (Ala.1979), vacated on other grounds, 448 U.S. 903, 100 S.Ct. 3043, 65 L.Ed.2d 1133 (1980); Lewis v. State, 295 Ala. 350, 329 So.2d 599 (1976). Whether a waiver is voluntarily, knowingly, and intelligently made depends upon the particular underlying facts and circumstances of each case, including the background, experience, and conduct of the accusedโthe totality of the circumstances. Chandler v. State, 426 So. 2d 477, 478 (Ala.Crim.App.1982) (citing Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)); Myers v. State, 401 So.2d 288, 291 (Ala.Crim.App. 1981), and cases cited therein. See also Dunkins v. State, 437 So.2d 1349 (Ala. Crim.App.), aff'd, 437 So.2d 1356 (Ala. 1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1329, 79 L.Ed.2d 724 (1984); Harris v. State, 420 So.2d 812 (Ala.Crim.App.1982); Rogers v. State, 417 So.2d 241 (Ala.Crim. App.1982); Dolvin v. State, 391 So.2d 666 (Ala.Crim.App.1979), aff'd, 391 So.2d 677 (Ala.1980). "`Any clear manifestation of a desire to waive is sufficient. The test is the showing of a knowing intent, not the utterance of a shibboleth.'" Lloyd v. State, 45 Ala.App. 178, 184, 227 So.2d 809, 814 (1969) (quoted with approval in Rogers v. State, 417 So.2d at 248)). The trial judge need only be convinced from a preponderance of the evidence to find a confession to have been voluntarily made. Harris v. State, 420 So.2d at 814. The voluntariness of a statement is a question of law for the court, to be determined upon preliminary proof, taken outside the presence of the jury, and such finding will not be disturbed on appeal unless it appears contrary to the great weight of the evidence, or is manifestly wrong. Marschke v. State, 450 So. 2d 177 (Ala.Crim.App.1984), and cases cited therein. Once the proper voluntariness and Miranda predicates are established, the fact that the incriminating statement was not recorded affects only its weight and not its admissibility. Mardis v. State, 423 So.2d 331 (Ala.Crim.App.1982). With these principles before us, we now turn to the facts and circumstances surrounding the giving of appellant's oral confession upon which we must rest our determination of whether appellant did effectively waive his constitutional rights.
The evidence presented at the suppression hearing disclosed that appellant was 18 years old when he made the incriminatory statement; that he had an I.Q. of from *742 70 to 85, which was in the "dull normal, dull average" range of intelligence; that he did not suffer from any psychoses, neuroses, or organic brain problems; that he knew what was going on; that he was of average physical condition; that he had completed the eighth grade in school; that he had been in custody over seven months; that he had been indicted, was awaiting trial, and had been appointed counsel; that he initiated and requested a visit from Sgt. Gay on September 9, 1981; that no police officer had had any contact with him between the time of his arrest on January 21, 1981, and the time of Sgt. Gay's visit with him; that at the time of his arrest he had made a statement to Sgt. Gay denying any involvement in the crime; that Sgt. Gay visited appellant in the Jefferson County Jail on the afternoon of September 9, 1981, at 2:31 p.m., and before any statement was made by appellant, Sgt. Gay asked him if he wanted his attorney and he said that he did not; that Sgt. Gay, prior to taking any statement from appellant, read him his Miranda rights, and he acknowledged that he understood them; that Sgt. Gay told appellant that he was the detective investigating the Tucker killings, for which appellant was charged, and appellant stated that he knew that, and that he did not blame Sgt. Gay, as that was his job; that appellant stated that he was going to be tried first and no matter how his case turned out, he would testify against Godbolt and Agee because they were all three together; and that Sgt. Gay again asked appellant if he had talked with his lawyer about that, and appellant responded, "No, I don't need to talk to him, because I've made up my mind to tell about it from the beginning"; that appellant then made the statement to Sgt. Gay that he grabbed the shotgun from Godbolt and shot the Tuckers; that Sgt. Gay's visit with appellant lasted only about 5 or 6 minutes; and that appellant was not threatened or abused or made any offers or promises or given any hope of reward of any kind in order to induce him to give a statement. Appellant did not testify during the supression hearing, and the testimony of Sgt. Gay stands uncontradicted. Sgt. Gay's testimony is supported by the testimony of Officer Ballard, who received the telephone call from appellant and passed his message to Sgt. Gay that appellant wanted to see him. Sgt. Gay's testimony is further bolstered by the testimony of Sgt. Miller, who accompanied Sgt. Gay when he visited appellant. Sgt. Miller testified that he heard appellant state that he had called Sgt. Gay and wanted to see him. Sgt. Miller further testified that he heard Sgt. Gay ask appellant if he wanted his attorney, and that he heard appellant say that he did not.
Upon a review of the above stated facts and taking into consideration the totality of the circumstances surrounding the giving of the confession, we are of the opinion that these facts and circumstances as a whole affirmatively disclose the voluntariness and volunteeredness of the confession. The record is clear that a full Miranda warning was given appellant and that there was no improper influence, threat, intimidation, coercive factors, or other inducement made to obtain the confession. Appellant was informed of his right to counsel and he clearly waived that right and chose to talk with Sgt. Gay.
It is asserted in brief that, on the day in question, appellant had discovered that one of his co-defendants had made bond and for some reason "this total experience traumatized the defendant and rendered him incapable of making a knowing and intelligent waiver". We have reviewed the record and do not reach this conclusion. As suggested by appellant, we have reviewed the testimony of Sgt. Gay and find that appellant's actions on the day in question support a conclusion that appellant was motivated to speak with Sgt. Gay out of revenge rather than trauma. The record tends to further indicate that appellant had read in the newspaper that a hearing had been held in the Agee case, and that some newspaper articles suggested that appellant's co-defendants might be witnesses against appellant. These events appear to have motivated appellant to contact Sgt. Gay. It appears obvious to us that appellant's actions and conversations with Sgt. Gay were directed toward insuring *743 that he, appellant, was not going to be the only one convicted in the Tucker murder case, i.e., that appellant was motivated by revenge. In Dunkins v. State, 437 So.2d 1349 (Ala.Crim.App.1983), a similar fact pattern was present. There a 19-year-old, almost illiterate defendant made a statement motivated by revenge, and in that case we stated: "That the defendant's statement was motivated by his feeling of revenge against Harris and induced by his desire to see Harris prosecuted for the murder and rape does not render his statement involuntary". Id. at 1352-53 (citations omitted.)

B
Appellant next contends that the confession should have been excluded because Sgt. Gay knew that he was represented by counsel, and yet proceeded to take a statement from him without contacting his counsel, and that this action was in violation of his Sixth Amendment right to counsel. He asserts that, once the State had knowledge that appellant had counsel, it was required to notify his counsel before it could conduct any further interviews with him. He further contends that, even if such notice is not required, the State's burden of proving a knowing waiver of the right to the presence of counsel is heavy and that the proof surrounding the taking of his statement fails to meet that burden. Appellant cites United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), to support his contentions. While we recognize the propositions espoused in the cited cases, we direct appellant to the language found in Wade, 388 U.S. at 237, 87 S.Ct. at 1937, where the Court stated: "Thus both Wade and his counsel should have been notified of the impending lineup, and counsel's presence should have been a requisite to conduct of the lineup, absent an `intelligent waiver.'" (Emphasis added.) It is readily clear that a defendant can waive his right to counsel even at "critical stages" of the proceeding.
Once adversary proceedings have commenced against an individual, he has the right to legal representation when the government interrogates him. Brewer v. Williams, 430 U.S. 387, 401, 97 S.Ct. 1232, 1240, 51 L.Ed.2d 424 (1977); Jordan v. Watkins, 681 F.2d 1067, 1075 (5th Cir. 1982). This court has previously held that where the interrogating officer knows that the accused is represented by counsel, but nevertheless interviews the accused at a time when counsel is not present, willingly and by subterfuge, bypassing the presence of defendant's counsel, the accused is denied his constitutional rights of counsel. Such denial is not cured by a contention that the inculpatory statement was voluntary. Thompson v. State, 347 So.2d 1371 (Ala.Crim.App.), cert. denied, 347 So.2d 1377 (Ala.1977), cert. denied, 434 U.S. 1018, 98 S.Ct. 740, 54 L.Ed.2d 765 (1978); Freeman v. State, 342 So.2d 435 (Ala.Crim.App. 1977). An accused may waive his right to have counsel present at an interrogation at a critical stage after counsel has been retained or appointed, the burden being on the prosecution to show that the waiver was voluntarily, knowingly, and intelligently made, and that the accused intentionally relinquished a known right or privilege to have his counsel present during questioning. Brewer v. Williams; Miranda v. Arizona; Fike v. State, 447 So.2d 850 (Ala. Crim.App.1984); Nelson v. State, 398 So.2d 421 (Ala.Crim.App.1981); Thompson v. State. That a constitutional right, such as the right to counsel, may be waived is not questioned. Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); United States v. Springer, 460 F.2d 1344 (7th Cir.), cert. denied, 409 U.S. 873, 93 S.Ct. 205, 34 L.Ed. 2d 125 (1972); United States v. Crisp, 435 F.2d 354 (7th Cir.1970), cert. denied, 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 116 (1971); United States v. Fellabaum, 408 F.2d 220 (7th Cir.), cert. denied, 396 U.S. 858, 90 S.Ct. 125, 24 L.Ed.2d 10 (1969). Thus, the fact that a defendant has an attorney does not mean, as a per se rule, that law enforcement officials cannot procure a statement of any kind from the *744 defendant without prior notice to, and the consent of, his attorney. Brewer v. Williams; Miranda v. Arizona; United States v. Springer; Nelson v. State; Thompson v. State.
In addition to arguing that the statement taken from the appellant without the presence of his counsel was a per se violation of his constitutional rights, appellant also argues that the State's failure to notify his counsel prior to taking his statement, while knowing that he had counsel and having been previously in contact with his counsel, constituted "indirect and surreptitious interrogation," bringing the case within the holdings of Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and Brewer v. Williams. The situation presented in this case is materially different from that in Massiah and Brewer. The facts do not support appellant's contention that the investigator's conduct amounted to indirect and surreptitious interrogation. Here, unlike Massiah and Brewer, appellant knew he was making an incriminating statement to the investigator, had himself sought the interview, was advised of his rights, was asked if he wanted his attorney, and deliberately chose not to request the presence of counsel. There is nothing in the record to support a contention that the State willingly and by subterfuge bypassed the presence of appellant's counsel.
Even if there is no per se rule and even if the instant case does not involve indirect and surreptitious interrogation, appellant further argues that an even higher Miranda burden is put on the State to show an effective, valid, and knowing waiver of counsel. He contends that here "a simple Miranda type warning is not enough", but "there must be a clear and simple explanation to the accused of his rights and the consequences of his actions".
Clearly, the burden is on the State to establish that appellant knowingly, intelligently, and voluntarily waived his right to counsel. Fike v. State; Thompson v. State. A defendant may waive his Sixth Amendment right to legal representation when the government interrogates him after the commencement of adversarial proceedings, but it is incumbent upon the prosecution to prove an intentional relinquishment of a known right or privilege. Jordan v. Watkins; Fike v. State.
"It is reasonably clear under our cases that waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case `upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' Johnson v. Zerbst, 304 U.S. 458, 464 [58 S.Ct. 1019, 1023, 82 L.Ed. 1461] (1938)." (Citations omitted.)
Edwards v. Arizona, 451 U.S. 477, 482-83, 101 S.Ct. 1880, 1883-84, 68 L.Ed.2d 378 (1981). It must clearly appear "that the accused deliberately and understandingly chose to forgo the assistance of counsel at such interrogation." United States v. Smith, 379 F.2d 628, 633 (7th Cir.), cert. denied, 389 U.S. 993, 88 S.Ct. 491, 19 L.Ed. 2d 486 (1967).
This court indulges every reasonable presumption against waiver of the right of counsel, and such a waiver must be affirmatively demonstrated to have been knowingly and intelligently made. Thomas v. State, 373 So.2d 1149 (Ala.Crim.App.), aff'd, 373 So.2d 1167 (Ala.1979), vacated on other grounds, 448 U.S. 903, 100 S.Ct. 3043, 65 L.Ed.2d 1133 (1980).
There being no per se violation by not having the appointed counsel of appellant present during the taking of the statement, we turn to the factual situation as previously set forth in part A of this discussion, upon which we must rest our determination of whether Jackson did effectively waive his Sixth, as well as his Fifth, Amendment rights. Based on the facts and circumstances previously discussed, we hold that appellant made an intentional relinquishment of his known right to have counsel present before talking to Sgt. Gay. The prosecution has met the strict standard.pa required to show a waiver of his Fifth and Sixth Amendment rights.

*745 C
Appellant stresses the fact that he was 18 years of age at the time the confession was made and had an I.Q. of from 70 to 85. While an accused's intelligence and literacy are important factors to consider, weak intellect or illiteracy alone will not render a confession inadmissible. Womack v. State, 435 So.2d 754 (Ala.Crim. App.), aff'd, 435 So.2d 766 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed. 2d 367 (1983). Moreover, the confessions of a minor are not ipso facto inadmissible; however, infancy is certainly a relevant factor bearing upon the voluntariness of a confession. A person whose age and mental faculties make him amenable to criminal sanctions is sui juris in matters relating to confessions and inculpatory statements. Parker v. State, 351 So.2d 927 (Ala.Crim. App.), writ quashed, 351 So.2d 938 (Ala. 1977); Boyd v. State, 350 So.2d 757 (Ala. Crim.App.1977); Clarke v. State, 51 Ala. App. 222, 283 So.2d 671 (1973), cert. denied, 292 Ala. 716, 289 So.2d 808 (1974).
In the case of People v. Lara, 67 Cal.2d 365, 62 Cal.Rptr. 586, 432 P.2d 202 (1967), cert. denied, 392 U.S. 945, 88 S.Ct. 2303, 20 L.Ed.2d 1407 (1968) (cited with approval by Judge Bowen in Parker v. State), the California Supreme Court stated:
"This, then, is the general rule: a minor has the capacity to make a voluntary confession, even of capital offenses, without the presence or consent of counsel or other responsible adult, and the admissibility of such a confession depends not on his age alone but on a combination of that factor with such other circumstances as his intelligence, education, experience, and ability to comprehend the meaning and effect of his statement.
"....
"[T]he mental subnormality of an accused does not ipso facto render his confession inadmissible, but is simply one factor, albeit of significant weight, to be considered with all others bearing on the question of voluntariness."
67 Cal.2d at 383-86, 62 Cal.Rptr. at 599-601, 432 P.2d at 215-217. See also Elrod v. State, 281 Ala. 331, 202 So.2d 539 (1967) (tender age or weak intellect will not alone render confession involuntary). For more recent statements of this rule, see Garrett v. State, 369 So.2d 833 (Ala.1979); Hines v. State, 384 So.2d 1171 (Ala.Crim.App.), cert. denied, 384 So.2d 1184 (Ala.1980).
Whether a juvenile has knowingly and voluntarily waived his Miranda rights is determined by a "totality-of-the-circumstances" approach. Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979):
"This totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved. We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so. The totality approach permitsโindeed, it mandatesโinquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights."
Id.
Many jurisdictions, including Alabama, have held admissible confessions made by young persons of subnormal mentality. See, e.g., United States v. Smith, 574 F.2d 707 (2d Cir.), cert. denied, 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978) (17-year-old with low I.Q.); Dunkins v. State, supra (defendant age 19 and almost illiterate); Jackson v. State, 375 So.2d 1271 (Ala.Crim. App.), cert. denied, 375 So.2d 1274 (Ala. 1979) (18-year-old with I.Q. of 69 and classified as "functional illiterate"); State v. Anderson, 379 So.2d 735 (La.1980) (17-year-old with mental age of 8 and I.Q. of between 50 and 69); Bean v. State, 234 Md. 432, 199 A.2d 773 (1964) (15-year-old with I.Q. of 74).
Appellant asserts that reversal is required, under the authority of Garrett v. *746 State and Hines v. State. Appellant, in the case sub judice, clearly does not fall within the holdings of Garrett and Hines. At trial, Dr. Callahan testified on behalf of appellant that appellant's I.Q. was between 70 and 85, which Dr. Callahan stated to be in the range of "dull average to borderline" intelligence. On cross-examination, Dr. Callahan stated he thought that appellant was "fully aware of what is going on." There was also testimony that appellant had finished the eighth grade. There is absolutely no showing that appellant was functioning in the range of mental retardation which would, standing alone, invalidate his confession. Appellant's being in the "dull average to borderline" intelligence is a far cry from being in the trainable but not educable category of Garrett and Hines.
To sum up, we have seen that a minor, even of subnormal mentality, does not lack the capacity as a matter of law to make a voluntary confession without the presence or consent of counsel, or to make a knowing and intelligent waiver of his right to counsel during a critical stage of the proceedings.
We have thoroughly reviewed the totality of the circumstances surrounding the confession, including the fact that appellant was 18 years old and had an I.Q. of between 70 and 85. Our assessment of these facts and circumstances convinces us that the confession was completely voluntarily given after a knowing and intelligent waiver of appellant's Fifth Amendment rights. Such a review also convinces us that appellant voluntarily, knowingly, and intelligently waived his Sixth Amendment right to counsel. Therefore, we find that appellant's confession was properly admitted into evidence.

VII
Appellant next contends that Act No. 81-178, Acts of Alabama 1981, approved March 31, 1981, repealed the capital felony statute under which appellant was indicted and thus the State's prosecution pursuant to this indictment was void. This argument has been found nonmeritorious by this court in Watkins v. State, 409 So.2d 901, 902 (Ala.Crim.App.1981), wherein we held:
"[T]he new death penalty statute (Act. No. 81-178, supra) did not repeal the old statute (Code ง 13A-5-30 through ง 13A-5-38) as to offenses occurring prior to the effective date of Act No. 81-178.... Section 20 repeals the old death penalty statute, but specifically provides: `This repealer shall not affect the application of pre-existing law to conduct occurring before the effective date of this act.'"
Appellant has failed to cite Watkins in brief and has extended no arguments as to why Watkins should not be considered valid at this time. Appellant's argument is without merit.

VIII
Appellant next contends that the indictment is overbroad in charging three separate and distinct capital offenses, and that the indictment is vague in not advising him of what he must defend against. Appellant also argues that, due to the enactment of the new criminal code, there was "no crime of first degree murder after January 1, 1980, in this state," and that the crime of rape was repealed by the same act. No authority has been cited by appellant to support his contentions.
The indictment in this case avers that appellant had committed capital offenses under three different sections of the capital murder statute. Only Counts 1 and 3 were submitted to the jury, and the jury found appellant guilty on both counts. The dismissal of Count 2 eliminated it from any further consideration. Sanders v. State, 278 Ala. 453, 179 So.2d 35 (1965); Barnett v. State, 16 Ala.App. 539, 79 So. 675, cert. denied, 202 Ala. 191, 79 So. 677 (1917). Therefore, we need only consider Counts 1 and 3.
In answer to appellant's argument that the indictment is overbroad, we direct appellant to Smelcher v. State, 33 Ala.App. 326, 327, 33 So.2d 380, 381 (1947), and the cases cited therein, where it is stated:

*747 "It is well settled by the decisions of this state that where offenses are of the same general nature and belong to the same family of crimes, and where the mode of trial and nature of punishment are the same, they may be joined in the same indictment in different counts."
See also Frye v. State, 369 So.2d 892 (Ala. Crim.App.1979); Harger v. State, 54 Ala. App. 242, 307 So.2d 51 (1974). A lengthy discussion on this matter is not necessary. Clearly Counts 1 and 3 each involve a capital murder charge of the same general nature, from the same family of crimes. The mode of trial and nature of punishment for capital crimes are the same. Clearly, the indictment is not overbroad.
Appellant argues that the indictment is also vague. Count 3 obviously charges appellant with rape-intentional killing pursuant to ง 13A-5-13(a)(3) rather than ง 13A-5-13(a)(3) as cited in the indictment. Appellant has not asserted, or made a showing of, actual prejudice due to this miscitation. A review of the code sections in effect on the date of this indictment indicates there was no ง 13A-5-13(a)(3) in the code.
"Miscitation of a code section does not void an indictment which otherwise states an offense; and, in the absence of a showing of actual prejudice to the defendant, reference to the erroneous code section will be treated as mere surplusage."
Bush v. State, 431 So.2d 563, 564 (Ala.), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983), and cases cited therein. No objection to this citation form was made by appellant at that time or at any time previous to the court's oral charge.
In further regard to appellant's vagueness argument, this court has previously stated:
"If there is no indictment form for an offense set out in Code ง 15-8-150, then an indictment which closely parallels the language of the statute creating the offense is generally valid. Harrison v. State, Ala.Crim.App., 384 So.2d 641 (1980).
"Pursuant to ง 15-8-25 Code of Alabama 1975, an indictment must state the facts constituting the offense, in ordinary and concise language, in such a manner as to enable a person of common understanding to know what is intended. It must likewise inform the accused not only of the nature of the offense, but also of the particular act or means by which it was committed. Harrison, supra, at 643."
Matthews v. State, 401 So.2d 241, 245 (Ala. Crim.App.), cert. denied, 401 So.2d 248 (Ala.1981). See also Wilder v. State, 401 So.2d 151 (Ala.Crim.App.), cert. denied, 401 So.2d 167 (Ala.), cert. denied, 454 U.S. 1057, 102 S.Ct. 606, 70 L.Ed.2d 595 (1981).
Our examination reveals that the indictment follows the statutory form of the crimes charged. It is a plain, concise, and definite written statement of the essential facts constituting the crimes charged. Furthermore, appellant was sufficiently apprised of the particulars of the offenses, to enable him to prepare a defense. Accordingly, appellant's vagueness claim is without merit.
Appellant's third objection to the indictment, that no crime of first degree murder or of rape existed at the time of the instant offense, is also without merit. While it is true that the indictment avers these component crimes in terms of the 1975 Code even though the crime arose after January 1, 1980, the effective date of the new criminal Code, the court's opinion in Potts v. State, 426 So.2d 886 (Ala.Crim. App.1982), aff'd, 426 So.2d 896 (Ala.1983), makes it clear that where the 1975 code offense definition is different from its new code counterpart, the 1975 component crime is the one to be pleaded and proved. See also Williams v. State, 461 So.2d 834 (Ala.Crim.App.1983).

IX
Appellant next contends that he was denied due process of law by the trial court's denial of funds to employ a surveyor to determine the exact location of the boundary line separating the Birmingham and Bessemer Divisions. A denial of funds *748 for the purpose of obtaining expert witnesses does not constitute a denial of constitutional rights. Wiggins v. State, 440 So.2d 1164 (Ala.Crim.App.1983); Thigpen v. State, 372 So.2d 385 (Ala.Crim.App.), cert. denied, 372 So.2d 387 (Ala.1979), cert. denied, 444 U.S. 1026, 100 S.Ct. 690, 62 L.Ed.2d 660 (1980). Appellant correctly points out that ง 15-12-21 Code of Alabama 1975, provides for reimbursement of reasonably incurred expenses when "approved in advance by the trial court". In Wiggins, 440 So.2d at 1167, we stated, "The trial judge must find some reasonable basis for the expenditure of State funds before he may authorize such."
Although no reason was stated as to why the trial court denied funds for the surveyor, it is well established in this jurisdiction that it is not necessary to prove the location of a county boundary line by expert testimony, for such may be proven by general reputation. Coleman v. State, 423 So.2d 276 (Ala.Crim.App.1982). Proof of the location of a boundary line can be made in less costly ways, and in this case, proper evidence of the boundary line's location was presented without the aid of an expert. Denial of appellant's motion was clearly within the trial court's discretion, Willis v. State, 441 So.2d 1030 (Ala.Crim. App.1983), and, absent a showing of abuse, we will not disturb the trial court's ruling. We find no abuse of discretion present in the trial court's denial of funds to hire a surveyor as an expert witness.

X
The trial court granted the State's challenge for cause as to four jurors who expressed their opposition to the death penalty. Appellant contends that this action violated his right to an impartial jury drawn from a cross-section of the community. We have carefully reviewed the contested proceedings wherein these prospective jurors were questioned by the court. These four individuals expressed adamant opposition to the death penalty under any circumstances.
The typical question presented to each of the four prospective jurors was in substance as follows:
"[Y]ou might remember and I'm just asking you to think of any circumstances you can think of, some particularly terrible crime like the Charles Manson case out in California, or James Earl Ray when he shot Martin Luther King, or when they shot President Kennedy or somebody would murder a little child. Can you think of any set of circumstances like that if you were sitting on a jury and you were convinced beyond a reasonable doubt that that person was guilty of the crime, can you see any circumstances where you would vote for the death penalty?"
The first prospective juror testified that he would not vote for the death penalty even if instructed by the trial judge that death was a possible punishment. The second prospective juror initially stated that he could impose the death penalty if he had to, but subsequently recanted, stating, "I don't believe in it, I just don't believe in it. I'm not going to concede." He was then re-asked the "under any circumstances" type question, to which he responded in the negative. The third prospective juror stated that he opposed the death penalty although he would find an accused guilty of a capital crime if sufficient evidence was presented. He further declared that he approved of life without parole, but there were no circumstances under which he could fix punishment at death. The final prospective juror testified in response to the "under any circumstances" question, "No, sir, absolutely. I don't believe in the death penalty." He also stated he could fix punishment "outside the death penalty," but could not impose the death penalty even if instructed by the court that it was a possible alternative.
Obviously these individuals would automatically vote against the imposition of capital punishment without regard to the evidence adduced at trial. As recently stated by the United States Supreme Court in Wainwright v. Witt, 469 U.S. 412, 420, 105 S.Ct. 844, 850, 83 L.Ed.2d 841 (1985) (quoting *749 Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)):
"This line of cases establishes the general proposition that a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court." (Emphasis added in Adams.)
In holding that the standards announced in Adams rather than the standards of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), should be applied to scrutinize the dismissal for cause of jurors who express opposition to the death penalty, the Court stated that "this standard likewise does not require that a juror's bias be proved with `unmistakable clarity.'" Witt, 469 U.S. at 424, 105 S.Ct. at 852.
In the case sub judice, the veniremen challenged for cause were clearly not prepared to "consider and decide the facts impartially and conscientiously apply the law as charged by the court." Id., 469 U.S. at 420, 105 S.Ct. at 850. These veniremen made it "unmistakably clear" that they were unwilling to consider imposition of the death penalty under any circumstances and they were therefore properly excluded for cause.
Appellant's contention that excluding these jurors violates his right to an impartial jury drawn from a cross-section of the community, recognized in Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), is foreclosed by Lockett v. Ohio, 438 U.S. 586, 596-97, 98 S.Ct. 2954, 2960-61, 57 L.Ed.2d 973 (1978), wherein the Court stated, "Nothing in Taylor, however, suggests that the right to a representative jury includes the right to be tried by jurors who have explicitly indicated an inability to follow the law and instructions of the trial judge."
We therefore find no error committed by the trial court in excluding the four individuals challenged for cause.

XI
While appellant was in custody, at the Jefferson County Jail, blood samples were taken from him by Neil Whitehead, a physician's assistant employed by the County. The purpose of taking appellant's blood sample was to determine his blood type. Appellant argues that Whitehead was "unqualified" as an expert to testify as to the taking of the samples because he was not a registered nurse and, consequently, subsequent evidence concerning his blood type should not have been admitted. No authority has been cited for these propositions. The issue is whether Whitehead's qualifications were such as to insure the reliability of the blood withdrawal aspect of the testing procedure. The well established rules regarding the qualifications of expert witnesses to testify before the jury have been clearly stated in this court's recent decision of Pinkerton v. State, 417 So.2d 606, 607 (Ala.Crim.App.1982), wherein we stated:
"Whether a witness is shown to possess the requisite qualifications to be called an expert is a preliminary question largely within the discretion of the trial court. The criterion for admission of expert testimony is that the witness, by study, practice, experience or observation as to a particular subject, has acquired a knowledge beyond that of an ordinary witness.
"Whether a particular witness is an expert is a matter largely within the discretion of the trial court, and this court will not disturb that judgment unless there has been an abuse of that discretion." (Citation omitted.)
See also Charles v. State, 424 So.2d 715 (Ala.Crim.App.1982); Meade v. State, 390 So.2d 685 (Ala.Crim.App.), cert. denied, 390 So.2d 693 (Ala.1980); Hunter v. State, 338 So.2d 513 (Ala.Crim.App.1976); Cobb v. State, 50 Ala.App. 707, 282 So.2d 327 (1973).
Whitehead testified that he had been employed by the County as a physician's *750 assistant in the County jail for four years and his duties entailed basic medical care for the inmates; that he performs between fifteen and twenty physicals per day, which include taking blood samples; that he has drawn more than two thousand blood samples; that he is a certified Emergency Medical Technician; that he has been formally trained in the techniques of drawing blood; that he was trained as an emergency medical technician at the Cooper Green Emergency Room, where he was employed for four years; and that he worked in a diabetes lab for one year, in where his job was to collect blood samples. After hearing this testimony, the trial judge overruled appellant's objection to the witness's qualifications. We likewise think the witness was qualified to take the blood samples and to testify on the subject of drawing blood samples under the circumstances of this case.

XII
Appellant made two demands for a preliminary hearing which were denied. Appellant was arrested on January 21, 1981. On February 12, 1981, appellant was present, with counsel, at a transfer hearing held in the Jefferson County Family Court. These proceedings were tape recorded; however, the tapes were subsequently destroyed before appellant's trial counsel could obtain copies. The first demand for a preliminary hearing was made on February 25, 1981, after the transfer hearing. An indictment was returned against appellant on April 17, 1981. The second demand for a preliminary hearing was made on May 22, 1981.
The purpose of a preliminary hearing is to determine whether probable cause exists, Elmore v. State, 445 So.2d 943 (Ala. Crim.App.1983), i.e., whether there is reasonable grounds to believe that a crime was committed, and whether there is probable cause for believing the defendant committed it. Coleman v. State, 44 Ala.App. 429, 211 So.2d 917, cert. denied, 282 Ala. 725, 211 So.2d 927 (1968), vacated on other grounds, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed. 2d 387, conformed to 46 Ala.App. 737, 239 So.2d 223 (1970). See also 21 Am.Jur.2d, Criminal Law, ง 413 (1981). The Alabama Supreme Court has held that a transfer hearing is "in the nature of a preliminary hearing to determine whether there is probable cause `for believing that the allegations are true and correct.'" Winstead v. State, 371 So.2d 418, 420 (Ala.1979). In this regard Justice Beatty stated in Gallagher v. State, 425 So.2d 1079, 1080 (Ala. 1983):
"The purpose of a transfer hearing has been stated by this court as being to establish whether there is probable cause for a child to be transferred from juvenile court for criminal prosecution as an adult.... The parties must be advised of their rights, informed of the specific allegations in the petition, and given an opportunity to admit or deny such allegations. Following a presentation of competent, material, and relevant evidence the court must find that this evidence proved beyond a reasonable doubt that the child committed the acts alleged in the petition. It is only then that the court can proceed to make proper disposition of the case." (Emphasis added.)
In the case sub judice, the transfer hearing served the purpose of a preliminary hearing in determining the existence of probable cause. A repetitious inquiry to determine probable cause is not necessary. Potts v. State, 426 So.2d 886 (Ala.Crim. App.1982), aff'd, 426 So.2d 896 (Ala.1983). Thus, the subsequent demands for a preliminary hearing by appellant were properly denied.
We also note that appellant's first demand for a preliminary hearing came after the 30-day period following appellant's arrest. "[F]ailure to demand a preliminary hearing within the 30-day statutory period waived his absolute right to a preliminary hearing". Id. at 893. Appellant's second demand came after the indictment had been returned against appellant. After an indictment has been returned, appellant has no right to a preliminary hearing, for the indictment is a determination of probable cause. Duncan v. State, 369 So. 2d 885 (Ala.Crim.App.1979). Appellant's *751 contention that he was denied important discovery material when the transfer hearing tapes were destroyed is without merit, the nature of the transfer hearing being for the purposes previously discussed and not for the purposes of discovery. See 21 Am.Jur.2d, Criminal Law ง 413 (1981). We therefore find no error resulting from the trial court's denial of appellant's demand for a preliminary hearing.

XIII
During the trial of this cause, appellant's attorney stated to the trial judge:
"Judge, it has come to my attention that some of the television cameras were shooting into the courtroom yesterday, and I have just seen them out in the hall. We would request they be instructed not to shoot through that window. I feel that would be prejudicial to Carnel Jackson if the jury saw someone looking in here. It would focus more on this case and the fact they may be involved in a news event and get away from the issue of whether or not he was guilty or innocent."
The trial judge denied the request, stating, "I'm not satisfied as to any prejudice that has inured toward the defendant in any manner." In his brief appellant asserts that the jury "was filmed by television cameras," thus placing undue pressure on the jury's decision and denying him due process as guaranteed by the Sixth and Fourteenth Amendments. Appellant cites no authority for this proposition. It does not appear that any evidence of "actual" filming was presented to the trial court, nor was there any showing of prejudice apparent from the record.
We view appellant's request to be wholly within the discretion of the trial court. In this regard, we have stated:
"The trial judge is vested with great discretion in the conduct of a trial, and, unless clear abuse of this discretion is apparent, the appellate courts will not interfere to set aside the lower court's action. Dolvin v. State, 51 Ala.App. 540, 287 So.2d 250 (1973). The trial court exercises this discretion in light of the circumstances of the particular case, and, in the absence of gross abuse, its actions are not reviewable by this court. McKee v. State, 253 Ala. 235, 44 So.2d 781 (1950)."
Snipes v. State, 364 So.2d 424, 427 (Ala. Crim.App.1978). See also Thomas v. State, 393 So.2d 504 (Ala.Crim.App.1981). To make a finding of prejudicial error upon the facts of this cause would require us to totally disregard the presumption in favor of the trial court's ruling and to resort to speculation to find some factual predicate for reversal. "Error is not presumed on appeal and this Court will not reverse a conviction where the alleged error is founded on bare suspicion and surmise." Kimbrough v. State, 429 So.2d 1143, 1146 (Ala. Crim.App.1983). See also Duncan v. State, 88 Ala. 31, 7 So. 104 (1889); Nolen v. State, 35 Ala.App. 249, 45 So.2d 786 (1950). We find no basis upon which the trial court could be said to have committed prejudicial error. Appellant's request was properly denied.

XIV
Appellant raises a general chain-of-custody argument for all physical evidence introduced at trial. We have reviewed the record and find it unnecessary to address the chain of custody for each individual piece of evidence. Appellant's primary objection appears to be directed to the testimony of Kevin Nappinger, forensic serologist, who testified as to the test results of various swabs and blood samples taken from the bodies of the victims.
Appellant contests the introduction of Nappinger's testimony, alleging that the chain of custody of the swabs and blood samples was not shown because Dr. Buttram, who delivered the items to Nappinger for testing, did not testify. The chain is complete up to this point, for each witness in the chain testified and accounted for the items. Furthermore, the various samples, when taken from the bodies, were labeled and sealed in containers and Nappinger received the evidence in the containers as sealed.
*752 In Sexton v. State, 346 So.2d 1177, 1180 (Ala.Crim.App.), cert. denied, 346 So.2d 1180 (Ala.1977), this court stated:
"To warrant the reception of an object in evidence against an objection that an unbroken chain of custody has not been shown, it is not necessary that it be proved to an absolute certainty, but only to a reasonable probability, that the object is the same as, and not substantially different from, the object as it existed at the commencement of the chain." (Citations omitted.)
The purpose of establishing a chain of custody is to show a reasonable probability that there has been no tampering with the item of evidence. Bell v. State, 339 So.2d 96 (Ala.Crim.App.1976). In passing upon the admissibility of such evidence, "the trial judge should consider the nature of the article and the circumstances surrounding its preservation and custody," and permit its introduction where continuity of possession is "sufficiently established to afford ample assurance of ... authenticity." Washington v. State, 339 So.2d 611, 615 (Ala.Crim.App.), cert. denied, 339 So.2d 616 (Ala.1976) (citations omitted). See also Yarber v. State, 375 So.2d 1231 (Ala.1979).
In Oury v. State, 53 Ala.App. 240, 298 So.2d 661 (1974), the evidence envelope was delivered to Pruitt, a state toxicologist. Pruitt apparently did not testify. Kilbourn, an assistant state toxicologist, tested the items in the envelope. No evidence was presented as to the location or custody of the envelope from its receipt by Pruitt to its testing by Kilbourn. The court held that no missing link in the chain of identification was present and that ample assurance of authenticity was shown. Id. at 243, 298 So.2d at 663. See also Powell v. State, 47 Ala.App. 582, 258 So.2d 923 (1972) (treating a similar factual situation).
In the case sub judice, "an accounting was made of each successive step in the handling of the evidence." Lowery v. State, 452 So.2d 897, 898 (Ala.Crim.App. 1984). While the better practice would have been to offer the testimony of Dr. Buttram, there was clearly sufficient evidence to establish with reasonable probability that the samples taken during the autopsies were the same as those tested by Nappinger. Waters v. State, 360 So.2d 358 (Ala.Crim.App.), cert. denied, 360 So.2d 367 (Ala.1978). See also Coleman v. State, 411 So.2d 814 (Ala.Crim.App.1981); Thomas v. State, 356 So.2d 210 (Ala.Crim.App.1977), writ quashed, 356 So.2d 214 (Ala.1978). There is no contention that the samples "were contaminated or altered in any way." Lowery, 452 So.2d at 899. Under the circumstances, we believe that the identification and continuity of possession were sufficiently shown to afford ample assurances of authenticity, so that the testimony of Nappinger was properly admitted.

XV
Appellant questions the sufficiency of the State's evidence as it relates to both Counts 1 and 3 of the indictment. He raised the question of sufficiency of evidence by motions to exclude upon the close of the State's case, and by motion for a new trial. These motions were denied.
As to Count 1, he argues that the only evidence linking him with the crime is his inculpatory statement and he questions its credibility by referring to it as the "11th hour" statement. His attorney implies in his summation to the jury, among other things, that it was a fabrication. However, appellant did not take the stand in his own behalf either at the suppression hearing or during trial to explain his incriminating statement. Instead, his defense consisted of cross-examination of the State's witnesses and arguments to the jury.
As to Count 3, he argues that there was no testimony that Mrs. Tucker was raped, nor that his statement alluded to a rape.
In deciding whether or not there is sufficient evidence to support the verdict of the jury and the judgment of the trial court, the evidence must be reviewed in the light most favorable to the prosecution. Cumbo v. State, 368 So.2d 871 (Ala. Crim.App.1978), cert. denied, 368 So.2d 877 (Ala.1979); Bass v. State, 55 Ala.App. 88, 313 So.2d 208 (1975). Conflicting evidence presents a jury question not subject to *753 review on appeal, provided the State's evidence establishes a prima facie case. Gunn v. State, 387 So.2d 280 (Ala.Crim. App.), cert. denied, 387 So.2d 283 (Ala. 1980); McBryar v. State, 368 So.2d 568 (Ala.Crim.App.), cert. denied, 368 So.2d 575 (Ala.1979); 7 Ala.Digest, Criminal Law, Key No. 1159.3. The action of the trial court in denying a motion for acquittal, in denying a motion to exclude the evidence, in refusing to give the affirmative charge, and in denying a motion for a new trial, must be reviewed by determining whether or not there exists legal evidence before the jury, at the time the motions are made, from which the jury by fair inference could find the defendant guilty. Thomas v. State, 363 So.2d 1020 (Ala.Crim.App. 1978). In applying this standard, the appellate court will only determine if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199 (Ala.Crim.App.1983); Thomas v. State. There is a presumption in favor of a jury verdict and when the trial court declines to grant a motion for new trial, that verdict is strengthened on appeal. Willis v. State. Therefore, when the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for acquittal, or motion to exclude the State's evidence, the refusal to give the affirmative charge, and the denial of a motion for new trial by the trial court do not constitute error. Young v. State, 283 Ala. 676, 220 So.2d 843 (1969); Willis v. State; Duncan v. State, 436 So.2d 883 (Ala.Crim.App.1983), cert. denied, 464 U.S. 1047, 104 S.Ct. 720, 79 L.Ed.2d 182 (1984); McConnell v. State, 429 So.2d 662 (Ala. Crim.App.1983). A verdict of conviction will not be set aside on the ground of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this court that it was wrong and unjust. Duncan v. State; Johnson v. State, 378 So.2d 1164 (Ala.Crim.App.), cert. quashed, 378 So.2d 1173 (Ala.1979).
In the case at bar, the trial judge correctly instructed the jury that Count 1 charged appellant with murder in the first degree wherein two or more human beings are intentionally killed by the defendant by one or a series of acts. To prove the corpus delicti as to Count 1, the State was required to prove the deaths of Mr. and Mrs. Tucker, and that their deaths were caused by the criminal agency of another. Johnson v. State; McDonald v. State, 56 Ala.App. 147, 320 So.2d 80 (1975). This was unquestionably established by the State by evidence independent of the confession. Both victims had been killed by shotgun blasts at the location where they were found. No weapon was found at the scene and their automobile was missing. To prove the corpus delicti, it is not necessary to prove that the victim's death was occasioned by the criminal agency of the defendant. Johnson v. State; James v. State, 339 So.2d 1047 (Ala.Crim.App.), cert. denied, 339 So.2d 1052 (Ala.1976).
Once there is independent evidence of the corpus delicti, it is not necessary that a confession be corroborated. Johnson v. State; King v. State, 49 Ala. App. 111, 269 So.2d 130 (1972). The confession of the accused, alone, may be sufficient to show his connection with the homicide if the corpus delicti is established by other evidence. Johnson v. State; Arnold v. State, 57 Ala.App. 172, 326 So.2d 700 (1976); Smith v. State, 25 Ala.App. 297, 145 So. 504 (1933); Minton v. State, 20 Ala.App. 176, 101 So. 169 (1924).
In the instant case, the State proved the corpus delicti by independent evidence; thus, the oral confession of appellant, which we have held to have been properly admitted into evidence, served to prove his participation in, and his guilt of, the crime for which he was charged and convicted.
Moreover, there was further evidence to support and corroborate appellant's confession. Appellant, Agee, and Godbolt were seen together on the night of the murder of the Tuckers. The shotgun which fired the three shells found at the scene of the crime, and which was unquestionably the *754 murder weapon, was traced to Godbolt, and was found in Mrs. Godbolt's yard. A hole in the ground at the scene with shot and wadding supports appellant's statement that Godbolt fired the gun into the ground. The wadded piece of paper found in Mrs. Tucker's blouse, which was determined to be Godbolt's telephone bill, pointed to Godbolt and his associates as the perpetrators of the crimes. A logical inference is that Mrs. Tucker somehow obtained the bill and intended that it serve to identify her attackers. Based upon the evidence presented, it is a fair inference from the evidence that appellant intentionally killed the Tuckers to prevent them from subsequently identifying him and his co-defendants for what they had done.
We find that there was sufficient evidence presented by the State to allow the jury to conclude beyond a reasonable doubt that appellant was guilty of the crime charged in Count 1, "[m]urder in the first degree wherein two or more human beings are intentionally killed by the defendant by one or a series of acts." ง 13A-5-31(a)(10).
The trial court correctly charged the jury that Count 3 charged appellant with rape when the victim is intentionally killed by the defendant. The trial court correctly charged the jury as to the definition of rape as well as to the requirement that, to constitute the capital offense, there must be the intentional killing of the person named in the indictment.
We disagree with appellant's contention that there was insufficient evidence of rape to support a conviction. The evidence showed that both Mr. and Mrs. Tucker had blood type A. Present in Mrs. Tucker's vaginal cavity were seminal fluid and sperm cells from a type O, secretor. Both appellant and Godbolt are type O, secretor. Agee is type A. The presence of sperm cells and seminal fluid from a male of blood type O clearly rules out marital intercourse as the source of the sperm in Mrs. Tucker's vagina. Based on the evidence that the Tuckers were last seen alive on Friday night and were found murdered the next morning, and that Mrs. Tucker had sperm and semen in her vagina from a male other than her husband, the jury could reasonably and logically infer that Mrs. Tucker was forced to have intercourse with one or more of her attackers. The fact that appellant and a co-defendant both have the same blood characteristics as the sperm found in Mrs. Tucker's vagina makes no difference. Even if the co-defendant was the one who actually raped Mrs. Tucker and appellant did not, appellant was properly indicted and tried as a principal though he may have only been an accomplice or aider and abettor in the act of rape. Sanders v. State, 423 So.2d 348 (Ala.Crim.App.1982) (which, although construing repealed ง 13-9-1, is applicable to ง 13A-2-23(2), for the latter section does not change the basic test for complicity; see Commentary to ง 13A-2-23); Ala.Code ง 13A-2-23(2) (1975).
"It is well established that a person present, aiding and abetting another in the commission of rape, is guilty as a principal and punishable equally with the perpetrator of the crime."
Biggs v. State, 331 So.2d 763, 764 (Ala. Crim.App.), cert. denied, 331 So.2d 765 (Ala.1976).
A person may be properly convicted of a capital offense if it is proven that he was an accomplice in the commission of the offense. Lindsey v. State, 456 So.2d 383 (Ala.Crim.App.1983), aff'd, 456 So.2d 393 (Ala.1984), cert. denied, 470 U.S. 1023, 105 S.Ct. 1384, 84 L.Ed.2d 403 (1985); Colley v. State, 405 So.2d 374 (Ala.Crim.App. 1979), rev'd on other grounds, 405 So.2d 391 (Ala.1981).
After examining the evidence and applying the proper standards of review, we find that there was sufficient evidence presented by the State to allow the jury to conclude beyond a reasonable doubt that appellant was guilty of the crime charged in Count 3, "[r]ape when the victim is intentionally killed by the defendant." ง 13A-5-31(a)(3).
Accordingly, appellant's motions to exclude and for a new trial based on the *755 assertion of insufficient evidence were properly denied.

XVI
During closing arguments, the prosecutor made certain statements concerning the testimony of William Cole. Appellant contends that these statements were highly prejudicial and that the trial court erroneously denied his motion for a mistrial based on these comments, which are as follows:
"William Cole, you saw his demeanor on that witness stand, nervous, whatever. You got to view him. He testified he had known these people before, Jackson, Agee and Godbolt. He saw them on prior occasions, lived out in area; you can consider him, his appearance, how he acted on there. I tried to ask questionsโ
"MR. JOHNSON: I'm going to object to this.
"THE COURT: Sustain. Mr. Gomany don't go too far with this, approach the bench, gentlemen.
"(Thereupon, there was an off the record discussion between the Court and all attorneys.)
"MR. GOMANY: William Cole testified that he saw three parties that Friday night, Agee, Godbolt and Jackson. He was with them at a party that night, late that night, and that Agee, Godbolt and Jackson all left together, and he didn't see them again until the next day.
"MR. JOHNSON: Judge, I'm going to object to that.
"THE COURT: Overrule.
"MR. GOMANY: And he said he saw Godbolt and he saw Agee and he saw Jackson the next day over in the area and he saw a shotgun.
"MR. JOHNSON: Judge, I'm going to object to that, and ask for a mistrial.
"THE COURT: Overruled. Disregard it, ladies and gentlemen, and Mr. Gomany don't go into Cole's statement anymore."
In Benford v. State, 435 So.2d 1327, 1333 (Ala.Crim.App.1981), this court stated:
"Whether a motion for a mistrial should be granted is often dependent upon what is heard and seen by the presiding judge. He is in a better position than an appellate court to make a correct determination of the motion, and the determination thereof is wisely vested in his sound discretion. An appellate court should not rule otherwise unless there has been a clear abuse of discretion." (Citations omitted.)
See also Wadsworth v. State, 439 So.2d 790, 792 (Ala.Crim.App.1983). "[T]he entry should be only a last resort, as in cases of otherwise ineradicable prejudice." Thomas v. Ware, 44 Ala.App. 157, 161, 204 So.2d 501, 504 (1967) (emphasis in original).
We find no abuse of discretion in the trial court's ruling, based largely on our view that the statements were not ineradicably prejudicial. The prosecutor's statement concerning Cole's seeing Agee, Godbolt, and Jackson "that night" was fairly supported by Cole's testimony. The final statement, in which appellant contends that the State deliberately misled the jury as to appellant's whereabouts, implying that Jackson was with Godbolt and Agee on the day following the murders, is subject to interpretation. The jury heard Cole, in fact, testify that he saw Agee and Godbolt Saturday at Godbolt's residence; that he saw Godbolt's shotgun standing in the corner; and that as he was leaving around 11:00 a.m., he met appellant coming up the street, but appellant did not enter Godbolt's apartment. Thus, the statements made by the prosecutor that "he said he saw Godbolt and he saw Agee and he saw Jackson the next day over in the area and he saw a shotgun" were reasonable interpretations of Cole's testimony.
"Counsel for both the defendant and the State are allowed wide latitude on drawing reasonable inferences from the evidence in their closing arguments. Both have the right to present their impressions from the evidence, if reasonable, and argue every legitimate inference.... Statements of counsel in argument to the jury must be viewed as in the heat of debate, and such statements are usually valued by the jury at their true worth and are not expected to become *756 factors in the formation of the verdict."
Sanders v. State, 426 So.2d 497, 509 (Ala. Crim.App.1982) (citations omitted).
Even if, as argued by appellant, the State was attempting to argue points not in evidence, the trial judge's actions cured any prejudice that may have resulted. In Hammins v. State, 439 So.2d 809, 811 (Ala.Crim.App.1983), this court held:
"When improper arguments are made to the jury, they will be considered eradicated by the trial judge if he sustains objections thereto and gives appropriate instructions to the jury. When prejudicial remarks have been made, the action of the trial court in regard to the arguments is reviewed with all presumptions in favor of such actions. There is a prima facie presumption against error where the trial court immediately charges the jury to disregard the prosecutor's improper remarks." (Citations omitted.)
The trial court, being in a better position to make a correct determination of effects of the prosecutor's actions, was properly within his discretion is overruling the motion for mistrial. The trial court sustained appellant's objection and the jury was properly and timely instructed to disregard the prosecutor's remarks; thus any prejudice that may have resulted from any remarks by the prosecutor was sufficiently eradicated.

XVII
Appellant argues that infliction of the death penalty would constitute cruel and unusual punishment because he was 17 years old at time of the offense. Appellant asserts that he was not subject to the death penalty for any acts allegedly committed in January 1981. Appellant has failed to cite any authority for these propositions. On February 12, 1981, appellant was transferred from the Jefferson County Family Court to the Circuit Court pursuant to ง 12-15-34, Code of Alabama 1975, and certified to be tried as an adult on the offenses charged in the indictment. Appellant does not contest the transfer proceedings, nor does he contest denial of youthful offender status. We find no error in those proceedings.
We agree with appellant that the age of the offender is an important consideration for the courts, especially in the juvenile transfer hearings, ง 12-15-34, and in the sentencing phase, where age is considered to be a mitigating circumstance, ง 13A-5-51(7). There is, however, no constitutional or statutory provision in Alabama which prohibits the sentencing of a minor to death when he or she is tried as an adult. The United States Supreme Court has not decided that juvenile status puts the death penalty in conflict with the Eighth Amendment. Ice v. Commonwealth, 667 S.W.2d 671 (Ky.), cert. denied, 469 U.S. 860, 105 S.Ct. 192, 83 L.Ed.2d 125 (1984). In Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982), the Court specifically stated, in footnote 5, "[W]e do not reach the question of whether ... the Eighth Amendment forbids the execution of a defendant who was 16 at the time of the offense."
This is not the first case in which a person of youthful age has committed a heinous crime and been sentenced to death. See, e.g., Davis v. State, 259 Ala. 212, 66 So.2d 714 (1953); Lynn v. State, 477 So.2d 1365 (Ala.Crim.App.1984) (affirming a death sentence imposed on a 16-year-old); Dunkins v. State, 437 So.2d 1349 (Ala. Crim.App.), aff'd, 437 So.2d 1356 (Ala. 1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1329, 79 L.Ed.2d 724 (1984). Such cases can be found in most state reporters. See, e.g., Herring v. State, 446 So.2d 1049 (Fla.), cert. denied, 469 U.S. 989, 105 S.Ct. 396, 83 L.Ed.2d 330 (1984); Clay v. State, 143 Fla. 204, 196 So. 462 (1940) (upholding a death sentence imposed on a 16-year-old); Stebbing v. State, 299 Md. 331, 473 A.2d 903, cert. denied, 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984); Eddings v. State, 616 P.2d 1159 (Okl.Cr.App.1980), rev'd in part on other grounds and remanded, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); Commonwealth v. Green, 396 Pa. 137, 151 A.2d 241 (1959); Commonwealth v. Zietz, 364 Pa. 294, 72 A.2d 282 (1950).
*757 An exception are those states, such as Texas and California, which by statute prohibit the imposition of a death sentence on a minor. See, e.g., People v. Superior Court of Alameda County, 159 Cal.Rptr. 310, 98 Cal.App.3d 39 (1979); Cammon v. State, 672 S.W.2d 845 (Tex.Crim.App.1984). Furthermore, in 43 C.J.S., Infants ง 206 (1978), we find the following: "Except as provided by statute, however, an infant is punishable in the same manner as an adult, and to the extent that capital punishment is constitutionally permissible, infants over a certain age may be subject thereto." (Footnotes omitted.)
It has long been the rule in Alabama that persons over the age of 14 are prima facie capable of committing a crime. LaBryer v. State, 45 Ala.App. 33, 222 So.2d 361, cert. denied, 284 Ala. 732, 222 So.2d 366 (1969); Hampton v. State, 1 Ala.App. 156, 55 So. 1018 (1911). See also ง 15-16-2, Code of Alabama 1975 (any person over 14 years of age charged with a crime is presumed to be responsible for his or her acts). As stated by that famous commentator, Blackstone, "But the law, as it now stands, and has stood at least ever since the time of Edward the third, the capacity of doing ill, or contracting guilt, is not so much measured by years and days, as by strength of the delinquent's understanding and judgment." Blackstone's Commentaries, Vol. IV, p. 23 (reprint of first edition with supplement, 1966). We are convinced that appellant was properly certified to be tried as an adult, and, as an adult, appellant was certified to be punished as an adult. See Eddings v. State, 616 P.2d at 1166. We therefore hold that when a juvenile stands trial as an adult, the mere fact of minority does not impede imposition of the death sentence and such does not constitute cruel and unusual punishment.

XVIII
Appellant contends that he has been denied due process because he was the only one, of the three individuals involved in these crimes, that received the death penalty.[4] Whether the death sentence is appropriate for a particular defendant in light of the penalties imposed on his accomplices was thoroughly examined in Williams v. State, 461 So.2d 834, 849 (Ala. Crim.App.1983), wherein we stated:
"While Beck, 396 So.2d at 664, obligates this Court to consider the punishment received by alleged accomplices, it does not require or direct that every defendant implicated in the crime receive the same punishment. `There is not a simplistic rule that a co-defendant may not be sentenced to death when another co-defendant receives a lesser sentence.... Each case is evaluated on its unique factual circumstances.'" (Citations omitted.)
In the case sub judice, appellant was the "triggerman," and, although the apparent events leading up to the deaths of the Tuckers were appalling and atrocious, appellant alone inflicted the ultimate cruelty upon these victims in taking their lives. In Williams, 461 So.2d at 849, we stated, "The fact that the defendant was the actual perpetrator of the crime, the triggerman, is an important and very significant factor to weigh in determining whether the defendant's sentence to death is excessive or disproportionate to the penalty imposed in the cases of his co-defendants ...." See also Justus v. State, 247 Ga. 276, 276 S.E. 2d 242, cert. denied, 454 U.S. 882, 102 S.Ct. 366, 70 L.Ed.2d 193 (1981); McClesky v. State, 245 Ga. 108, 263 S.E.2d 146, cert. denied, 449 U.S. 891, 101 S.Ct. 253, 66 L.Ed.2d 119 (1980). Appellant has not been deprived of due process by the fact that he received the death penalty for his part in the crimes.

XIX
Appellant contends that the trial court erred in allowing the State to exclude all *758 blacks from the petit jury through the State's use of its peremptory strikes. Appellant further asserts that the State should have been required to prove that its strikes were not made solely on the basis of race as part of a pattern of systematic exclusion. In the jury selection of the instant case, the prosecutor used his first strike to exclude a white and his remaining nine strikes to exclude nine blacks from the jury, thereby securing the all-white jury which tried this case.
In Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), the petitioner alleged that his equal protection rights had been violated by the prosecutor's purposeful exclusion of black persons from the jury panel through the use of peremptory strikes. After reviewing the nature and purpose of peremptory challenges, the United States Supreme Court held that the prosecutor's exercise of the peremptory challenge in any particular case is not to be judicially reviewed and evidence that the prosecutor used peremptory challenges to remove all blacks from the jury panel in a particular case will not support a claim of racial discrimination under the equal protection clause. Id. at 221-22, 85 S.Ct. at 836-37. The Court reasoned, as follows:
"The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court. The presumption is not overcome and the prosecutor therefore subjected to examination by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes. Any other result, we think, would establish a rule wholly at odds with the peremptory challenge system as we know it."
Id. at 222, 85 S.Ct. at 837.
In the instant case, however, appellant contends that, not only were all black persons improperly excluded in his case, but the prosecutor's exclusion in his case is an example of the State's systematic exclusion of black persons from serving on petit juries in Jefferson County. As recognized by the Swain Court, "this claim raises a different issue and it may well require a different answer." Id. at 223, 85 S.Ct. at 837. In acknowledging that the presumption protecting the prosecutor in a particular case may be overcome, the Court stated the following:
"[W]hen the prosecutor in a county, in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negroes who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, with the result that no Negroes ever serve on petit juries, the Fourteenth Amendment claim takes on added significance. ... In these circumstances, giving even the widest leeway to the operation of irrational but trial-related suspicions and antagonisms, it would appear that the purposes of the peremptory challenge are being perverted. If the State has not seen fit to leave a single Negro on any jury in a criminal case, the presumption protecting the prosecutor may well be overcome. Such proof might support a reasonable inference that Negroes are excluded from juries for reasons wholly unrelated to the outcome of the particular case on trial and that the peremptory system is being used to deny the Negro the same right and opportunity to participate in the administration of justice enjoyed by the white population. These ends the peremptory challenge is not designed to facilitate or justify."
Id. at 223-24, 85 S.Ct. at 837-38. However, the Court did not decide the issue because the record did not "with any acceptable degree of clarity, show when, how often, and under what circumstances the prosecutor alone has been responsible for striking those Negroes who have appeared on petit jury panels in Talladega County." Id. at 224, 85 S.Ct. at 838.
In his attempt to meet the burden enunciated by the Swain Court, appellant's counsel presented testimony of four local defense attorneys and one deputy district attorney of Jefferson County. This testimony clearly establishes that appellant has *759 not met his burden of proof. In fact, the testimony elicited from the attorneys clearly establishes under the test enunciated in Swain that blacks are not being systematically excluded from petit juries.
For example, appellant's first witness, Mr. Richard Jaffe, testified that "more often than not blacks would be struck off ... but that does not mean every case." Mr. Jaffe's testimony indicates that blacks were not excluded from every jury, such as where the victim was black. When asked if he could state that the district attorney's office struck blacks simply because they were black, the witness responded, "Absolutely not."
It is not necessary to extensively review the testimony of the remaining witnesses; suffice it to say that no witness could affirm that the State historically and consistently used its peremptory strikes to exclude all blacks from all juries. It is interesting to note that the testimony adduced at appellant's trial was quite similar to that described in Allen v. State, 414 So.2d 163 (Ala.Crim.App.1982), where we concluded that the evidence did not warrant a finding of systematic exclusion of blacks.
As in Swain, the record before us does not provide clear and convincing proof that "in case after case, whatever the circumstances, whatever the crime and whoever the defendant or victim may be," 380 U.S. at 223, 85 S.Ct. at 837, the prosecution was responsible for the removal of blacks. In an assessment of the exact burden this Swain language places on the defendant, it has been stated:
"[I]t appears that a defendant attempting to establish the systematic exclusion of blacks by the use of the peremptory challenge has the burden of proving the following facts: (1) that the prosecution, rather than the defense, was responsible for the removal of blacks by use of the peremptory challenge; (2) that this use of the peremptory challenge occurred in `case after case'; (3) that blacks were peremptorily challenged regardless of the circumstances of the case; and (4) that `no' blacks ever served on petit juries in the county involved." (Footnote omitted.)
Annot., 79 A.L.R.3d 14, 22 (1977). See also State v. Simpson, 326 So.2d 54, 56 (Fla. Dist.Ct.App.1976). Appellant has failed in establishing these elements of a prima facie case of systematic exclusion.
Foremost, the evidence failed to show a sufficient quantity of cases in which blacks had been peremptorily struck by the prosecution. "The prosecutor's use of peremptory challenges in only a few trials is clearly insufficient to state a prima facie case, as would be a pattern of exclusion which occurred for only a few weeks." Willis v. Zant, 720 F.2d 1212, 1220 (11th Cir.1983), cert. denied, 467 U.S. 1256, 104 S.Ct. 3546, 82 L.Ed.2d 849 and 467 U.S. 1256, 104 S.Ct. 3548, 82 L.Ed.2d 851 (1984) (footnote omitted). See also United States v. Pearson, 448 F.2d 1207, 1218 (5th Cir.1971) (wherein the court held that evidence "covering a period of time of one week [was] entirely too slender to overcome the presumption that an official ... has faithfully discharged his duties in a fair, even and constitutional manner"). In addition to being severely limited by covering a short time span, the evidence consisted of the personal experience of several attorneys; the record was insufficient as devoid of any proof about the many other criminal cases in Jefferson County. E.g., Hardin v. State, 475 S.W.2d 254 (Tex.Crim.App.1971), cert. denied, 408 U.S. 927, 92 S.Ct. 2511, 33 L.Ed.2d 339 (1972).
In addition to failing to show that the prosecution intentionally and historically struck black persons in "case after case," appellant failed to establish that black persons were excluded regardless of the circumstances of the case. Appellant primarily focused on the single circumstance where the defendant is black and the victim is white. The record does not disclose the prosecution's practices in trials involving non-black defendants; the review did not include every kind of case, "whatever the circumstances, whatever the crime and whoever the defendant or the victim may be." Swain, 380 U.S. at 223, 85 S.Ct. at 837 (emphasis added). This is a void fatal to appellant's claim. See, e.g., McMorris v. *760 State, 394 So.2d 392 (Ala.Cr.App.1980), cert. denied, 394 So.2d 404 (Ala.), cert. denied, 452 U.S. 972, 101 S.Ct. 3127, 69 L.Ed. 2d 983 (1981); Liptroth v. State, 335 So.2d 683 (Ala.Crim.App.), cert. denied, 335 So.2d 688 (Ala.), cert. denied, 429 U.S. 963, 97 S.Ct. 393, 50 L.Ed.2d 332 (1976); State v. Simpson; Hardin v. State.
Finally, from appellant's own evidence, we cannot conclude that any exclusion of blacks was the sole responsibility of the prosecution, because a defense attorney admitted in response to Judge Jasper's questioning, that he has used his peremptory strikes to exclude blacks; therefore, again, appellant's allegation lacks merit. A prima facie showing under Swain requires that the prosecutor alone is responsible for striking blacks. Swain, 380 U.S. at 224-25, 85 S.Ct. at 838-39.
Appellant's contention that the State should be required to prove that its use of the peremptory strike was not made solely on the basis of race, is also without merit. In Swain, 380 U.S. at 220, 85 S.Ct. at 836, the Supreme Court stated:
"The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control. ... It is often exercised upon the `sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another,'... upon a juror's `habits and associations,' ... or upon the feeling that `the bare questioning [a juror's] indifference may sometimes provoke a resentment'.... It is no less frequently exercised on grounds normally thought irrelevant to legal proceedings or official action, namely, the race, religion, nationality, occupation or affiliations of people summoned for jury duty." (Citations omitted.)
See also Allen v. State, 414 So.2d at 168 ("No appellate court should attempt to second guess the prosecution's use of its peremptory challenges"). We are therefore not inclined to require the State to prove, as appellant suggests, that its actions in striking blacks from appellant's jury were not made solely on the basis of race. Such a requirement would totally erode the peremptory strike system long honored in this state.
Thus, we conclude that appellant has not established that the Jefferson County prosecutor impermissibly exercised his peremptory strikes to exclude black prospective jurors solely in furtherance of racial discrimination. We cannot hold otherwise upon the record before us. To do so would undermine our peremptory strike system, which we have recognized as essential to the fairness of trial by an impartial jury. See Allen v. State, 414 So.2d at 167-68. While we are mindful of the heavy burden which Swain imposes upon the defendant challenging the prosecution's use of its peremptory strikes,[5] "[t]his burden flows from the discretionary nature of the peremptory challenge itself." United States v. Carter, 528 F.2d 844, 850 (8th Cir.1975), cert. denied, 425 U.S. 961, 96 S.Ct. 1745, 48 L.Ed.2d 206 (1976). We intend to preserve this discretionary nature of the peremptory strike. In furtherance of this intention, we reiterate that the use of the peremptory strike by a particular prosecutor can only be attacked by specific historical acts of an "acceptable degree of clarity" showing "when, how often, and under what circumstances the prosecutor alone has been responsible for striking" black persons, thereby demonstrating his intent "to deny the Negro the same right and opportunity to participate in the administration of justice enjoyed by the white population." Swain, 380 U.S. at 224, 85 S.Ct. at 838.

XX
In order to support the allegations asserted in the previous issue, appellant *761 sought to subpoena the records and notes of the district attorney and the members of his staff, in regard to their exercise of peremptory strikes. The trial court quashed the requested subpoena duces tecum, which appellant claims constituted reversible error.
In Dowdy v. Gilbert Engineering Co., 372 So.2d 11, 12 (Ala.1979), the Alabama Supreme Court stated:
"Whether a subpoena duces tecum should be enforced is, in the first instance, a question for the trial court. An order to quash should be reversed only for abuse of discretion. ... A judge abuses his discretion only when his decision is based on an erroneous conclusion of law or where the record contains no evidence on which he rationally could have based his decision." (Citations omitted.)
We find no abuse of discretion present in this case. The testimony of the witnesses called by appellant affirmatively shows that there is no systematic exclusion of blacks by the district attorney's office. The documents requested by appellant would have been merely cumulative of his witnesses' testimony. There was ample testimony from the witness stand to support the judge's ruling quashing the subpoena duces tecum. We, therefore, find no abuse of discretion present in his ruling on this matter.

XXI
As required by A.R.A.P. 45A, we have reviewed the entire proceedings of appellant's trial and deem it necessary to consider the holding of Duncan v. State, 436 So.2d 883 (Ala.Crim.App.1983), cert. denied, 464 U.S. 1047, 104 S.Ct. 720, 79 L.Ed.2d 182 (1984), as it relates to the facts of this case. No issue relative to Duncan was raised at trial or on this appeal; however, due to the holding of Duncan, and the factual similarities existing between Duncan and the case at bar, a review of Duncan is in order.
In Duncan, the defendant was charged in a two-count indictment with two separate capital felonies. The first count charged the nighttime burglary of an occupied dwelling when one of the occupants is intentionally killed, in violation of ง 13A-5-31(a)(4), and the second count charged murder in the first degree wherein two persons are intentionally killed by one or a series of acts, in violation of ง 13A-5-31(a)(10). Id. at 886. The jury returned two separate verdicts, finding the defendant guilty under each count. Id. The trial court then sentenced the defendant to two terms of life imprisonment without parole, to run consecutively. Id.
On appeal, this court first determined that "every element necessary to sustain a conviction under count one in the indictment was clearly proven." Id. at 905. The court then stated:
"Having determined that the evidence was sufficient to support appellant's conviction for the offense charged in count one of the indictment, we hold that his separate conviction and sentence under count two cannot be allowed to stand. To hold otherwise would allow appellant to be punished twice for killing the same person, Eva Sims."
Id. The court relied on ง 15-3-8, and the case of Wildman v. State, 42 Ala.App. 357, 165 So.2d 396 (1963), cert. denied, 276 Ala. 708, 165 So.2d 403 (1964), to reason that the killing of Eva Sims could not be used to convict the defendant of two capital offenses. Although not expressly stated, the court apparently based this result on double jeopardy grounds. The court then affirmed the burglary-intentional killing conviction and reversed the double-murder conviction and sentence and rendered judgment in the defendant's favor as to that charge.
If we were to follow the dictates of Duncan, we would be required to reverse and render judgment in favor of this defendant as to one of the verdicts returned by the jury. However, we hold that Duncan is incorrect in this regard, and that appellant was properly convicted of both rape-intentional killing and double-murder in the case sub judice.
*762 In expressly overruling the specific holding in Duncan, we start with a review of ง 15-3-8, which reads as follows:
"Any act or omission declared criminal and punishable in different ways by different provisions of law shall be punished only under one of such provisions and a conviction or acquittal under any one shall bar a prosecution for the same act or omission under any other provision. (Code 1923, ง 5204; Code 1940, T. 15, ง 287.)"
In Sporl v. City of Hoover, 467 So.2d 273 (Ala.Crim.App.1985), we held that "[t]his court's interpretation of ง 15-3-8, for double jeopardy purposes, is consistent with the United States Supreme Court's holding in Blockburger [v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932)]." Blockburger holds:
"The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not."
284 U.S. at 304, 52 S.Ct. at 182.
The court in Duncan overlooked the Blockburger rule and instead relied on Wildman v. State to support its incorrect reading of ง 15-3-8. In Duncan, 436 So. 2d at 905, the court quoted Wildman, 42 Ala.App. at 360, 165 So.2d at 400, stating:
"`It is also not open to dispute that if there were merely a single inseparable act violative of more than one statute, or if there were an act which itself violated one statute and was a material element of the violation of another, there would have to be single punishment.' Emphasis added [in Duncan.]"
The court considered the murder of Eva Sims a single inseparable act supporting the burglary-intentional killing charge as well as the double-murder charge, thus requiring the State to elect "as to which of the charges of homicide of Eva Sims it will prosecute." 436 So.2d at 905.
In Colston v. State, 350 So.2d 334, 335 (Ala.Crim.App.1976), rev'd, 350 So.2d 337 (Ala.1977), in reversing the appellant's murder conviction, which arose from the same facts upon which he had already been convicted for robbery, this court relied on Wildman and Title 15, ง 287, Code of Alabama 1940, recompiled 1958 (which was carried forward unchanged to our present statute, ง 15-3-8), to hold:
"The proof in the trial of Colston for robbery and the instant proof shows that the robbery and homicide were blended in the act and each offense was an incident of the other. The homicide was an act of violence as charged in the indictment for robbery, an incident to the robbery, and part thereof."
The Alabama Supreme Court, in reversing this court on the above quoted point, stated that this court had misinterpreted Title 15, ง 287, and held that Colston had committed two "separate and distinct crimes" which "clearly constituted two criminal offenses." 350 So.2d at 339. The court, quoting from Racine v. State, 291 Ala. 684, 687, 286 So.2d 896, 898 (1973), stated:
"`A plea of former jeopardy is unavailing unless the offense presently charged is precisely the same in law and on fact as the former one relied on under the plea. And this is true even if both cases are founded on the same facts but the crimes charged were not the same in law.'"
350 So.2d at 339. We find that the court's language in Racine restates the Blockburger rule, and limits the "material element" language found in Wildman,[6] and upon which the holding of Duncan rests.
*763 In the instant case, appellant was charged with rape-intentional killing and double-murder. The murder of Mrs. Tucker was an element of both offenses, but each offense also required proof of an element that the other did not. Proof of the rape-intentional killing count did not require proof of the killing of Mr. Tucker. Proof of the double-murder count did not require proof of the rape of Mrs. Tucker. We therefore conclude that under the test established in Blockburger, appellant was properly indicted and convicted for two separate and distinct capital offenses "notwithstanding a substantial overlap in the proof offered to establish the crimes," Iannelli v. United States, 420 U.S. 770, 785, n. 17, 95 S.Ct. 1284, 1293, n. 17, 43 L.Ed.2d 616 (1975). That part of Duncan which holds there cannot be two convictions where the death of one person is a "material element" in two capital charges is incorrect and due to be overruled on that narrow point.
Duncan also appears to prohibit double punishment under the facts existing in Duncan and in the case sub judice. We do not find it necessary to address this portion of Duncan's interpretation of ง 15-3-8 prohibiting double punishment under facts similar to those of Duncan and the instant case because we do not have a double punishment situation in this case. In the case at bar, appellant was sentenced to only one punishment and not two, as was Duncan.

XXII
The scope of our review in death cases is clearly set out in A.R.A.P. 45A. We have followed this standard in the case at bar and have found no "plain error or defect in the proceedings."
In reviewing appellant's death sentence by the three-tiered analysis of Beck v. State, 396 So.2d 645 (Ala.1980), we make the following findings: First, Jackson was convicted of murder in the first degree wherein two or more human beings are intentionally killed by one or a series of acts, in violation of ง 13A-5-31(a)(10), Code of Alabama (1975) (Blue Paperback Pamphlet 1978) (repealed 1981). He was also convicted of rape when the victim is intentionally killed, in violation of ง 13A-5-31(a)(3). These two offenses are, by statutory definition and designation, capital offenses. Second, we take judicial notice that similar crimes are being punished capitally throughout this State. See, e.g., Giles v. State, [Ms. 6 Div. 86, January 10, 1984] (Ala. Crim.App.1984) (multiple murders); Jones v. State, [Ms. 6 Div. 87, January 10, 1984] (Ala.Crim.App.1984) (multiple murders); Hill v. State, 455 So.2d 930 (Ala.Crim.App.), aff'd, 455 So.2d 938 (Ala.), cert. denied, 469 U.S. 1098, 105 S.Ct. 607, 83 L.Ed.2d 716 (1984) (multiple murders); Dunkins v. State, 437 So.2d 1349 (Ala.Crim.App.), aff'd, 437 So.2d 1356 (Ala.1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1329, 79 L.Ed.2d 724 (1984) (rape-intentional killing); Crawford v. State, 377 So.2d 145 (Ala.Crim.App.), aff'd, 377 So.2d 159 (Ala.1979), vacated on other grounds, 448 U.S. 904, 100 S.Ct. 3044, 65 L.Ed.2d 1134 (1980) (multiple murders). See also Beck v. State, 396 So.2d 645, 654, n. 5 (Ala.1981) (opinion after remand, as modified *764 on denial of rehearing);[7] Colquitt, The Death Penalty Laws of Alabama, 33 Ala. L.Rev. 213, 226, 231-232 (1982). In comparing the sentences received by appellant's co-defendants, see our discussion under Part XVIII, ante. And, third, our independent weighing of the aggravating and mitigating circumstances convinces us that the sentence of death is appropriate in relation to this defendant. There were no errors during the sentencing-phase hearings which adversely affected appellant's substantial rights. After hearing evidence during the sentencing-phase hearing of aggravating and mitigating circumstances; after being correctly charged by the trial court as to the applicable law; and being properly advised that if the mitigating circumstances outweighed the aggravating circumstances, the punishment would be life imprisonment without the eligibility of parole, but if the aggravating circumstances outweighed the mitigating circumstances, the punishment would be death, the jury returned a verdict fixing appellant's punishment at death. The trial court thereupon held a hearing to aid the court in determining whether or not the court would sentence appellant to death or to life imprisonment without parole. In its findings of fact (see Appendix A attached hereto and made a part hereof), the trial court found, as aggravating circumstances, the aggravation encompassed within the capital offenses alleged in the indictment. Kyzer v. State, 399 So.2d 330, 338 (Ala. 1981) (reversed on authority of Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980)); Bryars v. State, 456 So.2d 1122, 1133 (Ala.Crim.App.1983), rev'd on other grounds, 456 So.2d 1136 (Ala. 1984); Ala.Code ง 13A-5-35(4) (1975). The trial court further found as the mitigating circumstances that appellant had no significant history of prior criminal activity and that the age of appellant at the time of the commission of the crimes was 17 years. Thus, the trial court found the existence of two aggravating circumstances, and two mitigating circumstances. The aggravating circumstances arose inherently from the commission of the crimes. The trial court examined the aggravating and mitigating circumstances and found that the aggravating circumstances set out by law outweighed the mitigating circumstances, and sentenced Jackson to death. These findings and conclusions by the trial court were fully supported by the evidence in this case. The aggravating circumstances far outweigh the mitigating circumstances. We concur in the findings of the jury and the trial court that death is the appropriate sentence in this case.
In reviewing this sentence, we are also bound by the provisions of ง 13A-5-53, Code of Alabama 1975. Our findings above comply with ง 13A-5-53(a). In compliance with ง 13A-5-53(b) we find that: (1) There is no evidence that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) our independent weighing of the aggravating and mitigating circumstances convinces us that the sentence of death is appropriate in this case; and (3) considering the crimes committed and the defendant, the death sentence is neither excessive nor disproportionate to the penalty imposed in similar cases.
We have carefully searched the record in both the guilt and sentence phases of Jackson's trial, and we have found no error. It is our opinion that appellant received a fair trial and was ably represented by experienced counsel throughout the proceedings. Accordingly, appellant's convictions and sentence of death are due to be, and they are hereby, affirmed.
AFFIRMED.
All Judges concur.

*765 APPENDIX A

IN THE CIRCUIT COURT OF THE TENTH JUDICIAL CIRCUIT OF ALABAMA

STATE OF ALABAMA

VS

CARNEL JACKSON

CASE NO. CC 81-00887

ORDER OF THE COURT ON IMPOSITION OF THE DEATH PENALTY
The defendant in this case, Carnel Jackson, was charged by indictment of the grand jury of the Circuit Court of the Tenth Judicial Circuit of Alabama, in and for Jefferson County, Alabama, with the capital offenses of Section 13A-5-31(A)(10) Murder in the First Degree, wherein two or more human beings are intentionally killed by the defendant by one or a series of acts, wherein Myra Faye Tucker, a human being and Terry Wayne Tucker, a human being, were allegedly shot by the defendant with a shotgun. The defendant also was charged in the same indictment under Section 13A-5-31(A)(3) Rape when the victim is intentionally killed by the defendant. Said indictment charged Carnel Jackson, a male, with the rape of Myra Faye Tucker, a female, by forcible compulsion and that the said Carnel Jackson did intentionally kill the said Myra Faye Tucker. These charges are brought under provisions of the Alabama Death Penalty Statute, Code of Alabama, 1975, Section 13A-5-30 et seq.
This case came on to be heard before the Court and a jury of twelve men and women duly impaneled and sworn as required by law; whereupon the jury after hearing the evidence, the Court's charge as to the applicable law, including the lesser included of Murder as to the alleged victim, Myra Faye Tucker, under Count One in the indictment and Murder as to the alleged victim, Terry Wayne Tucker, under Count One in the indictment, and Rape in the First Degree as to the alleged victim, Myra Faye Tucker, as charged in Count Three in the indictment, and Murder as to the alleged victim under Count Three, as alleged in the indictment, found the defendant guilty of the Capital Offenses as charged in Count One in the indictment and found the defendant guilty of the Capital Offense as charged in Count Three in the indictment. The jury was polled as to each of the two verdicts and the verdicts were unanimous in finding the defendant guilty of the Capital Offenses and not of the lesser included offenses mentioned above. The Court announced the jury verdicts on November 19, 1981, and on said date commenced a punishment phase hearing before the same jury as required by the Supreme Court of Alabama in Beck v. State, 396 So.2nd, 645 (Supreme Court of Alabama, 1980 as modified on Denial of Rehearing March 6, 1981). After hearing evidence during the punishment phase hearing, the jury again was charged as to the applicable law, advising said Jury that if the mitigating circumstances outweigh the aggravating circumstances, then the punishment would be life imprisonment without eligibility for parole, but if the aggravating circumstances outweigh the mitigating circumstances as shown by the Court's Charge, then the verdict would be at death. After due deliberation, the jury returned a verdict fixing the defendant's punishment at death. The jury was individually polled and the verdict was unanimous.
This Court would commend the attorneys for both the state and the defense for putting aside any attempt to emotionally influence the jury with passion, prejudice or other arbitrary factors in arriving at the punishment as shown by the jury verdict. The makeup of this jury composed of eight white women and four white men impressed the Court with the interest and dedication of our citizens and peers. This Court in its qualifications to the jury requested as whether or not the jurors has any bias or prejudice that would influence their verdict. By their silence, they answered in the negative. Therefore, this Court is satisfied and does find that the elements of passion, prejudice or other arbitrary factors were not present in the jury's deliberations and findings fixing *766 punishment at death. The Court then announced the jury's verdicts and set November 20, 1981 at 10 A.M. for a further hearing as mandated by Sections 13A-5-32 and 13A-5-33. At said hearing, the defendant, his trial counsels, the Honorable Orson Pete Johnson and the Honorable George Andrews, and the Deputy District Attorneys, the Honorable Ken Gomany, and the Honorable Scott Boudreaux, were present and ready to proceed.

FINDING OF FACT FROM THE TRIAL
The Court makes the following finding of fact from the guilt phase portion of the trial before the jury: That Myra Faye Tucker, a female, age thirty-one years, was a resident of Sylacauga, Alabama; that she was married to Terry Wayne Tucker, a male, age thirty-one years, of Sylacauga, Alabama. That on January 17, 1981, that the bodies of the said Myra Faye Tucker and Terry Wayne Tucker were found in Jefferson County, Alabama, the Birmingham Division, both having been shot with a shotgun.
The Court further finds as a finding of fact from the guilt phase portion of the trial that according to Doctor Charles Bruce Alexander and Deputy Coroner Joe Canoy the cause of death to the said Myra Faye Tucker was a shotgun wound to the chest and breast area of her body and that the cause of death to the said Terry Wayne Tucker was a shotgun wound to the lower back portion of his body. At the time of the examination and autopsy of both the said Myra Faye Tucker and Terry Wayne Tucker, Doctor Alexander found that the wounds to each of them were reasonably calculated to cause death. Said wounds were described by Doctor Charles Bruce Alexander, a pathologist, and were shown by pictures introduced at the trial. From the autopsy also, Doctor Charles Bruce Alexander further testified that as a finding he determined semenal fluid containing the male spermatozoa in the oral cavity, the anal cavity and the vaginal cavity of the said Myra Faye Tucker. Subsequent to January 17, 1981, and on January 21, 1981, the defendant, Carnel Jackson, was taken into custody by Sergeant James E. Gay of the Birmingham Police Department. That at the time of the arrest, the defendant made no inculpatory statement implicating him in the death of Myra Faye Tucker or the said Terry Wayne Tucker. That blood samples were taken from the bodies of the said Myra Faye Tucker and the said Terry Wayne Tucker and the Court further finds as a finding of fact the proper chain of evidence was preserved in that the samples of blood and body fluids and swabs were taken by Deputy Coroner Joe Canoy to the Alabama Department of Forensic Sciences and turned over to Kevin Noppinger, a Criminal Serologist with said Department of Forensic Sciences. Kevin Noppinger subsequently testified and the Court makes the following finding of fact that the blood type of the said Myra Faye Tucker was Type A; that the blood type of the said Terry Wayne Tucker, her husband was Type A. That the blood type as shown by the swabs from the vaginal cavity were blood type ABO-O. Mr. Noppinger further testified that the said Terry Wayne Tucker could not have emitted the semenal fluids into the vaginal cavity of Myra Faye Tucker. Blood samples and secretion gauze were obtained from the defendant, Carnel Jackson, and these were properly transmitted to the said Kevin Noppinger. Mr. Noppinger further testified and the Court makes the following finding of facts, that the defendant's blood type was Type ABO-O. On approximately September 9, 1981, from the Jefferson County Jail in Birmingham, Jefferson County, Alabama, the defendant, Carnel Jackson, called the Birmingham Police Department, speaking to one Sergeant Ann Ballard, and the Court makes the following finding of fact, that the said defendant requested to speak to Sergeant James E. Gay. That the said Sergeant James E. Gay went to the Jefferson County Jail and after duly advising the defendant as to his Miranda Rights and Warnings, and after the proper predicate having been laid, the state introduced a confession-statement of the defendant, Carnel Jackson. The Court makes the following finding of fact, that the said Carnel Jackson waived his right to have his attorney *767 present and further did voluntarily and intelligently make a confession-statement to Sergeant James E. Gay. According to the said confession-statement and the Court makes the following finding of fact, that the defendant, Carnel Jackson, admitted that one Jerry Steven Godbolt fired the shotgun into the ground at the site where the bodies were found and the said Carnel Jackson took the shotgun away from the said Jerry Steven Godbolt and first fired, shooting Myra Faye Tucker, and then firing and shooting Terry Wayne Tucker. These gunshot wounds caused the death of said Myra Faye Tucker and the said Terry Wayne Tucker.

FINDING OF FACT FROM THE PUNISHMENT PHASE HEARING
At the punishment phase of this trial before the same jury, the state was allowed to show aggravating circumstances and the defendant was allowed to show mitigating circumstances. The mitigating circumstances as shown by the evidence and the Court makes the following finding that the defendant has no significant history of prior criminal activity and the age of the defendant at the time of the crime wherein it was shown that the defendant was seventeen years of age. The Court finds the following mitigating circumstances to exist, namely, the defendant has no significant history of prior criminal activity and secondly, the defendant was seventeen years of age at the time of the commission of the offense. The Court makes the further findings of fact that the aggravating circumstances were encompassed within the Capital Offenses as shown by Section 13A-5-31(A)(10) and by Section 13A-5-31(A)(3) and the Court makes further findings of fact that the components of the offense, namely, Murder in the First Degree, where two or more human beings were intentionally killed by the defendant, and the Court makes the following finding of fact, that the defendant, Carnel Jackson, did intentionally kill Myra Faye Tucker, after having engaged in sexual intercourse with the said Myra Faye Tucker, a female, by forcible compulsion and that in the course of said Rape, the said Carnel Jackson did intentionally cause the death of said Myra Faye Tucker by shooting her with a shotgun. The Court makes the further finding of fact from this hearing, that the aggravating circumstances as required by law outweigh any mitigating circumstances as shown during the punishment phase hearing and this hearing before the Court.
After due consideration of all the matters that were presented to the Court during this hearing both in mitigation and by aggravation and taking into consideration all other matters that were properly before the Court as hereinabove stated in this order, this Court does now find and is convinced beyond a reasonable doubt and to a moral certainty that the aggravating circumstances as shown above and brought before this Court are sufficient to uphold the jury's verdict affixing punishment at death.
It is, therefore, the judgment of this Court that this defendant, Carnel Jackson, should be sentenced to death.
DONE and ORDERED this 20th day of November 1981.
 /s/ Joseph J. Jasper
 Circuit Judge.

ON APPLICATION FOR REHEARING
PATTERSON, Judge.
OPINION MODIFIED; APPLICATIONS OVERRULED; RULE 39(k) MOTION DENIED.
All the Judges concur.
NOTES
[1] These sections as they appeared in Blue Supplement are a recodification of งง 13-11-2(a)(10), (2), and (3), Code of Alabama (1975).
[2] Godbolt v. State, 429 So.2d 1131 (Ala.Crim. App.1982).
[3] Agee v. State, 465 So.2d 1196 (Ala.Crim.App. 1984), cert. denied, (Ala.1985).
[4] Godbolt's sentence was fixed at death by the jury who convicted him of the robbery-intentional killing of Mrs. Tucker; however, the trial court sentenced Godbolt to life without parole. Agee was convicted under a two-count indictment for the robbery-intentional killing and the rape-intentional killing of Mrs. Tucker. He was also convicted under a separate indictment for the robbery-intentional killing of Mr. Tucker. The jury fixed punishment under each conviction to life imprisonment without parole; the trial court set the sentence likewise.
[5] Extensive criticism has been directed toward this burden. See, e.g., Willis v. Zant, supra; United States v. Childress, 715 F.2d 1313 (8th Cir.1983), cert. denied, 464 U.S. 1063, 104 S.Ct. 744, 79 L.Ed.2d 202 (1984). In its recent decision of United States v. Childress, the Eighth Circuit found only two successful Swain claims anywhere, State v. Brown, 371 So.2d 751 (La. 1979), and State v. Washington, 375 So.2d 1162 (La.1979). However, the burden is not insurmountable. United States v. Carter, 528 F.2d at 850.
[6] We believe that the "material element" language of Wildman is properly referring to cases such as those discussed in Illinois v. Vitale, 447 U.S. 410, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980), and Harris v. Oklahoma, 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977). In Harris, the defendant was convicted of felony-murder and was subsequently tried and convicted on a separate indictment for the felony during the commission of which the murder was committed. 433 U.S. at 682, 97 S.Ct. at 2912-2913. There the Court stated:

"When, as here, conviction of a greater crime, murder, cannot be had without conviction of the lesser crime, robbery with firearms, the Double Jeopardy Clause bars prosecution for the lesser crime after conviction of the greater one."
Id. In Vitale, 447 U.S. at 421, 100 S.Ct. at 2267, it is stated:
"[A] person who has been convicted of a crime having several elements included in it may not subsequently be tried for a lesser-included offenseโan offense consisting solely of one or more of the elements of the crime for which he has already been convicted. Under Brown [v. Ohio, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977)], the reverse is also true; a conviction on a lesser-included offense bars subsequent trial on the greater offense."
Our Supreme Court has acknowledged this line of reasoning in Clift v. State, 352 So.2d 838 (Ala.1977), cert. denied, 435 U.S. 909, 98 S.Ct. 1459, 55 L.Ed.2d 500 (1978). Thus, under the Blockburger analysis, as discussed in Clift, a material element may be applicable to two crimes charged against a single defendant, arising out of a single transaction, and double jeopardy will not act to bar a prosecution or punishment under either charge so long as "each provision requires proof of an additional fact which the other does not." Blockburger, 284 U.S. at 304, 52 S.Ct. at 182. "This test emphasizes the elements of the two crimes." Clift, 352 So.2d at 839.
[7] A listing of convictions for which a sentence of death was imposed under Alabama's Death Penalty Statute.